80 N.J. Super. 105 (1963)
193 A.2d 151
RACHEL ARMOUR DOYLE, PLAINTIFF,
v.
CHASE MANHATTAN BANK, ETC., ET AL., DEFENDANTS.
RUTH ARMOUR KAMEN, PLAINTIFF-APPELLANT,
v.
CHASE MANHATTAN BANK, ETC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1962.
Supplemental Briefs Filed February 26, 1963.
Decided May 2, 1963.
*107 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Allan H. Klinger argued the cause for appellant Ruth Armour Kamen (Messrs. Milton, Keane & De Bona, attorneys).
Mr. Elmer J. Bennett argued the cause for respondents (Messrs. Carpenter, Bennett & Morrissey, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Ruth Armour Kamen, income beneficiary of a trust created under Article Seventh of the will of her father Bernard R. Armour, appeals from a summary judgment entered in favor of defendants-trustees on March 16, 1962, in her action seeking a refund of $18,935.72 which, she alleges, they improperly took as income commissions.
The Armour estate has been in our courts since 1949. We have carefully reviewed the voluminous files relating thereto, particularly the accountings in In re Armour, Docket P-30-49, as well as the files relating to the respective testamentary *108 trusts of plaintiff, her sister Rachel Armour Doyle and her sister Toby Armour Schneider, in both the trial and appellate courts. All of the material facts are either matters of record in the Superior Court or set forth in the undisputed affidavits filed on behalf of defendants.

I.
Bernard R. Armour died December 1, 1949. By Article Seventh of his will, admitted to probate December 19, 1949, he gave, devised and bequeathed his residuary estate in equal shares in trust for his three daughters, respectively: plaintiff Ruth, who is now Mrs. Kamen; Rachel, now Mrs. Doyle; and Toby, now Mrs. Schneider. Testator appointed the Manhattan Company of New York City (now the Chase Manhattan Bank), his brother George L. Armour, and his friend and counsel, George F. Lewis, as his executors and trustees. The terms of the three trusts were identical. In each case the trustees were directed to apply so much of the net income as in their sole judgment was necessary and proper for the education, support and maintenance of the particular daughter until she attained the age of 21, when all excess income accumulated was to be paid to her. Thereafter, and until the termination of the trust, they were to pay her the total net income. Upon marriage, the trustees were to pay the named daughter one-third of the principal of the trust as then constituted, and upon the daughter's death the trust was to terminate and the principal paid over to those designated in the will. All of testator's daughters were minors at the time of his death; Ruth became 21 on October 17, 1953, Rachel on May 21, 1955, and Toby on September 21, 1957.
On January 23, 1953 George F. Lewis, Jr. succeeded his father, George F. Lewis (resigned), as co-executor and co-trustee, and when the father died on November 17, 1953 he became sole executor of his estate. George F. Lewis, Jr. served until the date of his death, September 27, 1960. Alfred Levy became co-trustee in his place on April 25, 1961.
*109 Defendants and their predecessors set up the residuary trusts while the estate was still being administered by them as executors, and from time to time they transferred identical amounts of accumulated income from the estate to each of the trusts. The dates and amounts with respect to each trust were as follows:

 December 29, 1950 ................. $121,000.00
 November 5, 1951 .................. 40,000.00
 May 8, 1952 ....................... 92,000.00
 April 14, 1953 .................... 20,000.00
 May 28, 1953 ...................... 2,000.00
 June 26, 1953 ..................... 42,000.00
 April 16, 1954 .................... 30,000.00
 December 28, 1954 ................. 15,000.00
 April 20, 1956 .................... 15,000.00
 ___________
 $377,000.00

By Article Sixth of his will, testator left $100,000 in trust for charitable purposes. Having been advised that income accumulated in this trust should also be paid over to the residuary trusts, the executors in July 1954 transferred $1,714.35 from the Article Sixth trust to each of the residuary trusts.
Defendants or their predecessors, as executors of the Armour will, filed two intermediate accounts. The first was filed January 11, 1952 and covered the period through November 30, 1951. Under the Schedule of Income Allowances this account specifically showed the transfer to plaintiff Ruth's residuary trust of the first two sums above listed  $121,000 and $40,000. The Schedule also set forth in detail the income commissions routinely taken by the executors without court allowance, as permitted by the statute, N.J.S. 3A:10-2 (formerly N.J.S.A. 3:11-2 and 3:11-2.2) amounting to $42,552.54 at the then statutory rate of 5% on all income received through November 5, 1951, which included all the income transferred to plaintiff's residuary trust. The complaint for the allowance of this account named plaintiff *110 as a party defendant. (She was a minor when the complaint was filed, but had become of age when the account was approved.) Notice of settlement of the account was duly mailed to Martha S. Armour, her mother and guardian, as provided by the court rules. Thereafter exceptions to the account were filed by Messrs. Milton, McNulty & Augelli, the predecessor firm of plaintiff's present counsel, as attorneys for Martha S. Armour, Ruth's general guardian. The exceptions were dismissed after a trial, and on June 5, 1954 the Chancery Division entered a judgment which recited that counsel were appearing for Ruth Armour, then of full age, and which included the following:
"The said accountants be allowed the sum of $42,552.54 which they have taken as statutory commissions on income collected by them during the period covered by the account."
On March 4, 1955 the Armour executors filed their second intermediate account covering the period from December 1, 1951 through November 30, 1954. This account, under its Schedule of Income Allowances, specifically showed the transfers to Ruth's residuary trust of the next five items set out in the list of distributions above: $92,000, $20,000, $2,000, $42,000 and $30,000, respectively. The Schedule also detailed the income commissions routinely taken by the executors, amounting to $23,158.85 at the then statutory rate of 5%, on income received during the period of the accounting, which included all of the income transferred to plaintiff's residuary trust. The complaint for the allowance of the account named plaintiff as a party defendant. She was then of full age. Notice of settlement of the account was duly mailed to her in accordance with the court rules. Her attorneys, Messrs. Milton, McNulty & Augelli, then filed exceptions to the account, addressed primarily to the corpus commissions requested by the executors and the fees requested by their attorneys. There was no exception taken to the income commissions. On November 10, 1955 the Chancery Division entered judgment allowing the account, reciting *111 the appearance of counsel for Ruth Armour Kamen, formerly known as Ruth Armour, and which included the following:
"The said accountants be allowed the sum of $23,158.85 which they have taken as statutory commissions on income collected by them during the period covered by the account."
This judgment was appealed with respect to the executors' corpus commissions and the fees allowed their attorneys. Thereafter, on October 2, 1956, the Chancery Division entered judgment on the mandate on appeal, which judgment repeated the above-quoted adjudication with respect to the allowance of statutory income commissions.
On February 10, 1954, the trustees of the trust established under Article Sixth of the Armour will filed their account as such trustees for the period December 1, 1950 through November 15, 1954. Under the Schedule of Income Allowances this account specifically showed that the trustees had taken commissions of $171.58, at the rate of 5%, on all income received by them during the period covered by the account, totalling $3,431.70. The sum of $1,714.35 of accumulated income which, as we have already stated, was transferred into plaintiff's residuary account in July 1954, represented the balance of income remaining after the deduction of such commissions and other proper charges against the Article Sixth trust income. The complaint for the allowance of the trustees' account named plaintiff, then of full age, as a party defendant. Notice of settlement of the account was duly mailed to her in accordance with our rules of court. The Chancery Division judgment allowing the account was entered April 28, 1954. It recited the appearance of Messrs. Milton, McNulty & Augelli, as attorneys for Ruth Armour, and included the following:
"The said trustees be allowed the sum of $171.58 which they have taken as statutory commissions on income of said trust collected by them."
*112 On June 13, 1958 the trustees of plaintiff's trust filed their account covering the period from December 29, 1950 through November 30, 1957. Examination of the account shows that it was divided into two parts. The first was a final account with regard to the one-third part of the trust which, under Article Seventh of the will, had vested in plaintiff on her marriage. The other was the first intermediate account with regard to the remaining two-thirds of the trust which was to continue during plaintiff's lifetime. The Schedule of Income Charges showed that accumulated income had from time to time been transferred from the estate to the trust in the period December 29, 1950 to April 20, 1956, in the amounts heretofore stated and aggregating $377,000. The Schedule of Income Allowances showed that the trustees had not taken income commissions prior to filing the account.
The trustees' complaint seeking allowance of the account stated, in paragraph 2 of the First Account:
"* * * In addition to the said payment of principal there was paid to the said trustees by the said executors on or about December 29, 1950, the sum of $121,000.00 in cash which had been accumulated by the said testator. Thereafter from time to time, there was paid over to the said trustees by the said executors additional amounts of such accumulated income which, together with such original payment of accumulated income aggregated $377,000 in amount. The said trustees, in addition to the aforesaid payments of accumulated income, received on or about July 2, 1955 income in the amount of $1,714.35, which had accumulated in their hands as trustees of the trust established under Article Sixth of the Last Will and Testament of the said testator. All such accumulated income as well as all such principal was invested when received from time to time and was thereafter kept invested for the use and benefit of the testator's said daughter, Ruth."
Paragraph 10 of the account, summarizing that part dealing with the share of the trust not vested in plaintiff, gave the following information with respect to income:

"THE ACCOUNTANTS CHARGE THEMSELVES AS FOLLOWS:

Amounts received from time to time from the Executors
 of the Last Will and Testament of Bernard R.
 Armour, deceased ............................................ $372,000.00

*113
Amount received from the accountants as Trustees of the
 Trust established under Article Sixth of the Last
 Will and Testament of Bernard R. Armour, deceased ........... 1,714.35
Additional amounts received during period covered by
 this account ................................................ 252,484.58
 ____________
 $626,198.93"

And Paragraph 11, summarizing that part of the account dealing with the share of the trust which had vested in plaintiff, contained the following information with respect to income:

"THESE ACCOUNTANTS CHARGE THEMSELVES AS FOLLOWS:

Amount received during the period covered by this
 account including the sum of $5,000 received from
 the Executors of the Last Will and Testament of
 Bernard R. Armour, deceased ................................ $10,612.59"

The trustees' complaint then requested allowance of income commissions as follows:
"* * *

(c) Income commissions at the rate of 5% on
 $619,371.08 of income received prior to 6/10/57 ......... $30,968.55
 Income commissions at the rate of 6% on
 $17,440.44 of income received since 6/10/57 ............. 1,046.42
 ___________
 $32,014.97
 Less income commissions taken ............................. 12,536.50
 ___________
 Balance of income commissions due ......................... $19,478.47

* * *"
It is clear from a reading of the last-quoted material that income commissions were therefore being requested on $636,811.52 ($619,371.08 plus $17,440.44), and this included the $377,000 of income received from the executors (the $372,000 mentioned in the excerpt from Paragraph 10, and the $5,000 mentioned in the excerpt from Paragraph 11, above). It also included the $1,714.35 of income received from the Article Sixth trust, as shown in the excerpt from Paragraph 10 above. The complaint and account made it equally clear *114 to plaintiff and the other beneficiaries that the trustees were asking for statutory income commissions on funds which had already passed through their hands as executors.
Plaintiff's name headed the list of persons named as parties defendant in Paragraph 8 of the complaint seeking approval of the trustees' account. She was duly served with copies of the complaint and its accompanying order to show cause. Plaintiff was represented throughout by the firm of Milton, McNulty & Augelli. She filed no exceptions to the allowance of the income commissions requested in connection with her trust. On September 29, 1958 a judgment, approved as to form by her counsel, and allowing the trustees' account, was entered by the Chancery Division judge who had conducted all of the Armour proceedings. The judgment recites that the attorneys had appeared for plaintiff and included the following adjudication:
"The trustees be allowed the sum of $32,014.97 as statutory commissions on income received by them during the period covered by the complaint against which they will credit the sum of $12,536.50 which they have already taken on account of such commissions."

Plaintiff took no appeal.
On June 13, 1958, the same day the trustees filed their account with respect to plaintiff's residuary trust, they filed one with respect to the trust set up for plaintiff's sister, Rachel, now known as Rachel Armour Doyle, covering the same period. Rachel filed no exception to the allowance of the income commissions requested by the trustees with respect to her trust. The commissions were allowed and Rachel, like plaintiff, took no appeal.
The trustees allege that they were also about to file an account with respect to the third of the residuary trusts, that set up for plaintiff's sister Toby (now known as Toby Armour Schneider), when they filed those covering plaintiff's trust and Rachel's. However, Mrs. Schneider married just as the trustees were about to do so, and they therefore decided to delay and restate the account so that it would reflect the *115 vesting of her one-third interest. The account for Toby Schneider's residuary trust was therefore filed after those for plaintiff and her sister Rachel had been allowed. Meanwhile, Toby had substituted new attorneys in place of the firm of Milton, McNulty & Augelli. Although the substituted attorneys had not participated in the prior executors' accounting proceedings or in that relating to the Article Sixth trust, they were able to ascertain from an examination of the court records the facts with respect to alleged double income commissions on which they based an exception to the allowance of income commissions out of Toby's trust. The Chancery Division upheld the exception. The trustees appealed to this court, which unanimously reversed the trial court judgment. In re Armour's Will, 61 N.J. Super. 50 (App. Div. 1960). The Supreme Court thereafter granted certification, 33 N.J. 114 (1960), and by its opinion rendered December 5, 1960 reinstated the judgment of the Chancery Division, holding that only one commission was allowable on the income in question. In re Armour's Will, 33 N.J. 517, 85 A.L.R.2d 529 (and annotation). The trustees' application for a rehearing was denied in January 1961.
By letter dated February 6, 1961 plaintiff requested that the trustees refund half, or $18,850, of the commissions taken on the $377,000 of income accumulated for her and then transferred from the estate to her trust. The trustees refused, and plaintiff instituted the present action in the Chancery Division on June 29, 1961. Her sister Rachel had instituted a similar action only a few weeks before. The two actions were consolidated on motion, and defendants-trustees gave notice of a motion for summary judgment dismissing the complaint, accompanied by supporting affidavits. These affidavits showed, among other things, that George F. Lewis, one of the three original trustees, had resigned in January 1953. He was succeeded by his son, George F. Lewis, Jr. As earlier noted, the father died soon after, and the son, in turn, died in September 1960. The income commissions allowed the trustees by the Chancery Division judgment of December 29, *116 1958 were shortly thereafter paid over to the trustees, including George F. Lewis, Jr. and the executors of his father's estate. The commissions so paid over had been included in the respective Lewis estates, subjected to New York and federal income taxes, and been substantially distributed. Such commissions had also been paid over to George L. Armour, an original trustee, who paid New York and federal income taxes on them and expended monies in reliance on the judgment. Similarly, the Chase Manhattan Bank, the third of the trustees, had received its share of the commissions and included them in its income for income tax, franchise tax, dividend and other purposes. Defendant (substituted) trustee Alfred Levy did not become co-trustee of plaintiff's trust until April 1961, long after all the income commissions in question had been allowed and paid out of the trust. He neither paid out nor received any of the commissions, so that no reason appears for having made him a party defendant.
One other matter should be mentioned. On September 29, 1961, the attorneys for the trustees wrote to the respective counsel of plaintiff and her sister Rachel stating that in view of the Supreme Court's decision in In re Armour's Will, above, the trustees were willing to refund the income commissions on the $15,000 transferred from the estate to each of the residuary trusts on December 28, 1954, and the like sum transferred on April 20, 1956, inasmuch as the commissions had not been allowed them in any executors' account. Thus, the amount of duplicate commissions in controversy, $18,935.72, was reduced by $1,500, or 5% of $30,000. (Plaintiff has credited $3,000 against the $18,935.72, but her calculation obviously proceeded on the basis of 5% of not only the $30,000 transferred to her trust, but the $30,000 which had at the same time been transferred to her sister Rachel's trust.)
Although plaintiff appealed the Chancery Division summary judgment in the consolidated action, her sister Rachel, who latterly has been represented by the same substituted attorneys as Toby engaged, has not.

*117 II.
In her complaint, plaintiff alleges that she took no exception to the payment of the $18,935.72 in income commissions to the trustees because their complaint and account failed to disclose that they had already taken income commissions in their capacities as executors of the estate and as trustees of the Article Sixth trust. She advances the same contention on this appeal  the trustees' failure to disclose, and a resultant breach of their fiduciary duty. She attacks the conclusion reached by the Chancery Division judge who, in granting defendant's motion for summary judgment, pointed out that the judgments in the Ruth Armour Kamen and Rachel Armour Doyle trusts had been entered September 29, 1958, and no appeal had been taken with reference to the income commissions; consequently, the judgments upon the respective accounts were res judicata, citing In re Leupp, 108 N.J. Eq. 49 (Ch. 1931).
Plaintiff, however, makes the frank admission that "Had there been disclosure in the trustees' account that commissions on the income in question had been taken by them previously as executors, the plaintiff would then have been on notice and, had she then failed to except to the account, concededly the judgment would then have been binding."
We find that the judgment allowing the trustees' account in plaintiff's residuary trust was entered on full notice that commissions were being sought and allowed on accumulated income which had been transferred from the estate to that trust. Plaintiff stresses there was no disclosure in the trustees' account of the commissions which had previously been taken by them as executors on the income in question. The charge of nondisclosure is made in general terms. Plaintiff does not mention that she was a party to and appeared in the proceedings for the allowance of the first and second intermediate executors' accounts in which defendants or their predecessors made the fullest disclosure possible that they were taking executors' commissions on the very *118 income in question. She says nothing of the judgments entered on those accounts, expressly allowing the executors their statutory commissions. Nor is there any mention of the fact that the same firm of attorneys represented her in every estate and trust proceeding and accounting touching her interests, including the executors' and trustees' accounts wherein income commissions on the accumulated income in question were allowed and approved by judgment.
Plaintiff would avoid the fact that her sister Toby, who excepted to the allowance of income commissions to the trustees when they accounted as to her residuary trust, was readily able to raise the issue of double income commissions on exactly the same records and information as were available to her. She speaks of Toby's having "independently acquired knowledge" of the payment of executors' income commissions on the $377,000 transferred to her trust from the estate. But she volunteers no explanation of how, when and where her sister "independently acquired" such knowledge. There is only one source from which Toby, and plaintiff as well, could possibly have acquired that knowledge, and that was from the executors' accounts where the facts were fully disclosed. We incidentally note that paragraph 8 of the trustees' complaint on application for settlement of their account with regard to Toby's trust, lists plaintiff's name and address first among the persons having a possible interest in the proceeding. The complaint and its accompanying order to show cause were served upon her, so that she was fully alerted to the proceedings, including the exception which Toby's attorneys filed.
Defendants' affidavits in support of their motion for summary judgment established full disclosure to the beneficiaries, including plaintiff, that they had taken income commissions on the $377,000 as executors. Plaintiff filed no answering affidavit, notably one which would have shown that Toby's knowledge came from some source other than the accounts filed in the Chancery Division.
*119 The information contained in the accounts and final judgment of the Chancery Division were more than adequate to raise the question of double income commissions. Absent the decision of the Supreme Court in Armour, above, competent counsel might reasonably have adopted the view, as plaintiff's counsel in fact did, that commissions were allowable to defendants on the accumulated income in their separate capacities as executors and trustees. In this connection, see the opinion of this court appearing in 61 N.J. Super. 50, which the Supreme Court reversed.
Plaintiff does not here contend that the judgment under review, which was consented to by counsel for the respective parties as to form, should be set aside because of fraud or mistake. She had, as we have indicated, the same opportunity to inform herself as did her sister Toby later. She is bound by the judgment of September 29, 1958 approving the trustees' account. In re Leupp, above, 108 N.J. Eq. 49, 58-59 (Ch. 1931); and see 7 N.J. Practice (Clapp, Wills and Administrations) (3d ed. 1962), § 1471, p. 194; cf. Maloney v. Kinkead, 130 N.J. Eq. 169 (Ch. 1940), affirmed 131 N.J. Eq. 111 (E. & A. 1942).
Plaintiff cites such cases as Liberty Title & Trust Co. v. Plews, 6 N.J. Super. 196 (App. Div. 1950), affirmed on this point 6 N.J. 28 (1950); Isham v. Union County Trust Co., 7 N.J. Super. 488 (Ch. Div. 1950), certification denied 5 N.J. 352 (1950), and McAllister v. McAllister, 120 N.J. Eq. 407 (Ch. 1936), in support of her contention that a judgment allowing a fiduciary's account will not be held to be res judicata where there is nondisclosure. Those and similar cases involve self-dealing transactions by the fiduciary which were not disclosed to the beneficiaries. We are not cited to any case where, as here, all the pertinent facts were expressly disclosed to the beneficiary in prior accounting proceedings.

III.
Plaintiff's second contention is that defendants-trustees should, in the interest of substantial justice, be compelled to *120 refund the income commissions taken under the September 29, 1958 judgment approving the trustees' account. Here, quite clearly, she entirely forgets the concession made under her first point (i.e., nondisclosure)  that if the trustees had disclosed their previous taking of income commissions as executors, the judgment approving the trustees' account would have been binding because she was on notice and failed to except to the account or take an appeal. It is obvious that she has now shifted her argument to a claim that equitable considerations should obtain.
In taking double commissions defendants relied on the provisions of N.J.S. 3A:10-2 and its predecessor statute, providing that a fiduciary is entitled to commissions at a fixed rate (5%, later changed to 6%) on all income which comes into his hands, and this without court allowance. They also relied heavily on the case of Pitney v. Everson, 42 N.J. Eq. 361 (E. & A. 1886), an opinion by former Chief Justice Beasley, and incidentally on Strawbridge v. Strawbridge, 35 N.J. Super. 125 (Ch. Div. 1955). This is made manifest in their briefs filed on appeal to this court in the Toby Armour Schneider trust, in the Supreme Court on Toby's appeal, and after that court had reversed, on petition for rehearing.
Pitney v. Everson dealt with corpus commissions, but the Supreme Court made no effort to evaluate Chief Justice Beasley's holding beyond acknowledging its "legal potency," at the same time pointing to contrary decisions in other corpus commission cases reached on the basis of their particular factual pattern. See In re Armour's Will, above, 33 N.J., at pages 522 et seq. True, as the Supreme Court there observed, plaintiffs cited no case establishing a construction of the statute, N.J.S. 3A:10-2, which would support their claim to income commissions, first as executors and later as trustees. Its own research for a specific precedent proved fruitless, and such has been our experience also. Nonetheless, it can fairly be said that defendants and their predecessors, both as executors and trustees, discharged their fiduciary duties with care and great competence in an estate presenting unusual difficulties. *121 There is not even a suggestion in the files we have examined to indicate that they failed to carry out these duties with the utmost regard for what was demanded of them. The same may be said of their counsel, who showed the highest legal competence and integrity. Counsel and the trustees may have had no positive precedent as regards income commissions, but they reasonably relied upon the statute and their own analysis of what they considered to be the distinctive duties and responsibilities which had to be carried out in their respective roles as executors and then trustees. Our decision in the Toby Armour Schneider trust, 61 N.J. Super. 50, indicates that at least one court agreed with defendants' construction and application of the income commission statute.
Assuming that the law prior to the Supreme Court decision in Armour, above, 33 N.J. 517, clearly established that what Chief Justice Beasley had to say in Pitney v. Everson about corpus commissions was in fact reversed by the Armour case, then it would appear that the principle set forth in Miller v. McCutcheon, 117 N.J. Eq. 123 (E. & A. 1934), would be applicable. The court there quoted Mr. Justice Pitney, speaking for the United States Supreme Court in John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475, 478 (1922):
"* * * a change in the authoritative rule of law, resulting from a decision by this court announced subsequent to the former decree, neither demonstrates an `error of law apparent' upon the face of that decree, nor constitutes new matter in pais, justifying a review." (117 N.J. Eq., at page 129)
The court further said that
"It should also be observed that the final judgments of our courts would be seriously jeopardized and property rights stand on very insecure foundations if rehearings and bills of review were entertained to vacate final decrees, when the time to appeal has passed, and others have acquired vested rights, save in the well recognized instances herein mentioned.

* * * * * * * *
It is sound jurisprudence and public policy as well that there should be finality to judgments of courts of competent jurisdiction *122 which parties let go unchallenged, by failing to exercise their right of appeal." (at page 130)
Accord: Lockwood v. Walsh, 137 N.J. Eq. 445 (Prerog. 1946), where the taxpayer relied on a memorandum, prepared by counsel and submitted to the Inheritance Tax Division, concluding that his interest was contingent. Similarly, defendants and their predecessors here relied on competent counsel's opinion that income commissions passing through their hands as executors, and later as trustees, were authorized by the statute and our case law.
Turning to an alternative assumption  that no line of authority actually existed prior to the Supreme Court decision in Armour which would have supported the trustees' taking of income commissions on the $377,000 transferred to plaintiff's residuary trust from the estate  nevertheless, the principle is clear that the Chancery Division error in applying existing law, embodied in the judgment approving the trustees' account entered September 29, 1958, was correctible only on appeal. Such an error is not a mistake for which a judgment will be opened. In Wootton v. Pollock, 124 N.J. Eq. 167 (Ch. 1938), affirmed per curiam, 125 N.J. Eq. 432 (E. & A. 1939), petitioner sought review of a Chancery order denying revivor against an executor and legatees on the ground that a "mistake of law" on the part of the court resulted in a special equity requiring that the order be opened and vacated. The vice-chancellor who decided Wootton noted that in view of a later decision by the Court of Errors and Appeals in Carter v. Fidelity Union Trust Co., 120 N.J. Eq. 578 (1936), it appeared that the order complained of was contrary to prior Chancery decisions; it would have rendered the denial of revivor erroneous and resulted in a reversal had there been an appeal. The court recognized the rule quoted from Miller v. McCutcheon, above, but went on to say:
"Of course the so-called special equity in the instant case does not arise by reason of a change in the law after decree entered. That which gave rise to petitioners' allegation of a special equity *123 rests on error of the court in applying existing law * * *." (124 N.J. Eq., at page 172)
Without attempting to pass on the extent to which Chancery would go in granting a bill for review on "special equities," or further discussing the question as to whether our courts, in employing the term "special equity," have not used it as referring to newly discovered evidence or fraud, the vice-chancellor stated:
"* * * I think it is clear that the reason assigned by petitioners herein does not constitute a special equity justifying the relief sought for, but it seems clear that the mere fact that a case is not well decided, resulting in an erroneous decree, must be corrected by appeal and not by review." (Ibid.)
And in In re Wood, 140 N.J. Eq. 542 (Prerog. 1947), the court, in dismissing a petition to open an Orphans Court decree settling a trustee's account on the ground of mistake, said:
"* * * Allegations of mistake are also presented which may be characterized as `the approval by the court of sundry items in the account which petitioner urges should not have been allowed. It is not shown that the judge misapprehended the nature of the items, or did not intend to approve them. If his action was in any way incorrect, it was mere error. Error is not a mistake for which a decree will be opened.' Brown v. Fidelity Union Trust Co., 135 N.J. Eq. 404." (140 N.J. Eq., at page 547)
Thus, if the Supreme Court decision in In re Armour's Will be considered merely as giving expression to a rule which has always been the law in New Jersey, though unexpressed, rather than as overruling an authoritative rule of law, the facts of this case establish that the Chancery Division judge merely erred in applying the law when he entered the September 29, 1958 judgment, as discovered by the Supreme Court in 1960. Plaintiff's remedy was therefore by way of appeal. Error in the application of the law does not present sufficient grounds to support an independent action to open a judgment.

*124 IV.
We need not rest this decision on the alternative assumptions just discussed in III above, but prefer to deal with the matter on plaintiff's chosen ground in urging that defendants should, in the interest of substantial justice, be compelled to refund the income commissions they were allowed as trustees. She argues that the Chancery Division judgment approving the trustees' account unjustly enriches them and should be reopened. She asserts that her present action is, in substance, an independent proceeding for relief from the judgment, under R.R. 4:62-2.
That rule, in the main, deals with motions to relieve a party from a final judgment for any of the following reasons: "(a) mistake, inadvertence, surprise or excusable neglect; (b) newly discovered evidence * * *; (c) fraud * * *, misrepresentation, or other misconduct of an adverse party; * * * or (f) any other reason justifying relief from the operation of the judgment or order." The motion must be made within a reasonable time, and for reasons (a), (b) and (c), not more than one year after the judgment or order was entered.
Our courts have long had the inherent power to grant relief from their judgments, and this power was not affected by the adoption of our court rules. Indeed, R.R. 4:62-2 expressly provides that the rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding." And see Wilford v. Sigmund Eisner Co., 13 N.J. Super. 27, 33 (App. Div. 1951), where Judge (now Mr. Justice) Brennan pointed out that
"Relief for any reason allowed by the rule rests in the sound discretion of the trial court, controlled by accepted legal principles, whenever such action is appropriate to accomplish justice. * * * Equitable principles may be a guide in administering relief to determine in the particular circumstances whether justice and equity require that relief be allowed. * * * The rule grants a broad power to trial courts to set aside judgments in proper cases, but the *125 power is not a new one; the courts of this State have always had power to control, vacate or correct their own decrees in the interests of justice. * * *."
That case involved an application to open and vacate a judgment entered in the Law Division dismissing plaintiff's case on the ground that his claim was based upon a compensable accident for which relief should be obtained in the Workmen's Compensation Bureau. After entry of that judgment plaintiff instituted a proceeding in the Bureau, which dismissed his claim because his condition was due to an industrial disease not covered by the Compensation Act. The matter came before this court on a consolidated appeal from the decision of the Bureau and from the Law Division's denial of plaintiff's application to set aside its dismissal of the judgment. Although it would appear that plaintiff there had a much better basis for relief than does the present plaintiff, this court affirmed, stating that its decision "need not depend upon plaintiff's lack of diligence in seeking relief; in any event we are unable to find in the record a state of facts which establishes a right to relief for the reasons assigned by him even if the application had been made within the year, let alone any evidence of extraordinary hardship to justify relief after that time." (at page 34)
Relief may be granted under the "any other reason" provision of subsection (f) of R.R. 4:62-2 only where such reason is not one included among those specified in subsections (a), (b) and (c), and there is also a showing of extreme hardship and the equities clearly run in favor of the party applying for relief from the judgment. Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949), cited in Wilford v. Sigmund Eisner Co., is a leading authority on this point. That case construed and applied amended Rule 60(b) of the Federal Rules of Civil Procedure, whose language is almost the same as our R.R. 4:62-2. The question there was whether a default judgment revoking Klapprott's naturalization certificate should be opened more *126 than four years after it was entered, on the ground that Klapprott was at the time of his default, and for years thereafter, ill, without funds, and in jail on other federal charges which were ultimately dismissed. The Supreme Court, by a 5-4 vote, reopened the judgment. There were five separate opinions, three supporting the majority result and two dissenting. However, all the justices agreed that the judgment could not be opened more than a year after it had been entered on the basis of the "any other reason" provision, unless the "other reason" was one not included among those specified in subsections (1), (2) and (3) of the federal rule, which are the same as our subsections (a), (b) and (c). The majority held that Klapprott's allegations set up an extraordinary situation which could not fairly or logically be classified as mere "neglect" on his part, so that the one-year limitation of subsections (1), (2) and (3) of federal rule did not apply.
In the later case of Ackermann v. United States, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950), the United States Supreme Court considered an application to open a judgment cancelling a certificate of naturalization. Naturalization proceedings had been instituted against petitioner, his wife and her brother. They were consolidated for trial. The brother appealed his denaturalization, and ultimately the judgment against him was reversed and the complaint dismissed. The Ackermanns did not appeal, but Ackermann thereafter moved to reopen the judgment against him. The majority of the Supreme Court held that the motion was properly denied because petitioner alleged that his failure to appeal was excusable, and a motion for relief because of excusable neglect, as provided in Federal Rule 60(b) (1) had to be brought not more than one year after judgment entered. The Ackermann judgment was more than four years old. But petitioner also sought to bring himself within subsection (6) of the rule  "any other reason justifying relief"  under the Klapprott decision. The grounds on which Ackermann relied were that the denaturalization judgment was erroneous, and *127 the reason he did not appeal and raise that question was because his attorney had advised that he would have to sell his home to pay costs, while the Alien Control Officer, in whom he had confidence, told him to "hang onto their home" and he would be released at the end of the war. The majority said that petitioner "made a considered choice not to appeal," apparently because he did not feel an appeal was worth the possible sacrifice of his home. His was a calculated and deliberate risk, and he could not be relieved of his free choice because hindsight indicated that his decision not to appeal was probably wrong. Said the court: "There must be an end to litigation some day, and free, calculated, deliberate choices are not to be relieved from."
Plaintiff does not charge fraud and misrepresentation. Nor is this a case of misconduct on the part of an adverse party. There is no newly discovered evidence, in the legal sense. At best, plaintiff must depend upon mistake, inadvertence or excusable neglect. Her failure to move against the Chancery Division judgment within a year of its entry on September 29, 1958 was, as in Ackermann, a free and deliberate choice. There is nothing in this case like the elements present in Klapprott  lack of due process and financial and physical harassment  and which moved the Supreme Court majority to reopen the default judgment. On the other hand, the circumstances here are no more persuasive than those in Ackermann to move us to reopen the judgment for "any other reason." Cf. Cronheim v. Tennant, 30 N.J. 360 (1959), where certain stockholders who had not received final liquidating dividends from trustees in liquidation brought an independent action attacking the final judgment and supplemental order of the Chancery Division allowing the trustees' account. The trial court dismissed the action, stating that plaintiffs were "seeking to attack collaterally a judgment which they could and should have attacked directly. All parties had notice of the proceedings. There was a complete absence of fraud." The Supreme Court affirmed.

*128 V.
A closer look at plaintiff's resort to the equities of the situation and her contention that "substantial justice" requires a reopening of the Chancery Division judgment approving the trustees' account, must lead to the conclusion that the preponderance of the equities is on the side of defendants.
The judgment, as we have several times stated, was entered in September 1958. The complaint in the accounting in the residuary trust set up for Toby Armour Schneider was filed May 20, 1959. Her new counsel filed exceptions to the account on August 17, 1959. The Chancery Division judgment disallowing income commissions to the trustees was entered October 8, 1959. Plaintiff must have known of that determination, but she made no move. She remained quiescent while Toby's case wended its way through this court and the Supreme Court. The Supreme Court decision came down, as we have said, December 5, 1960, reinstating the Chancery Division's disallowance of income commissions to Toby's trustees. However, plaintiff still took no action, except to ask for a refund on February 6, 1961. It was not until June 29, 1961 that she filed her complaint demanding a refund. This was two years and nine months after the judgment in her trust accounting, and more than one year and eight months after the Chancery Division judgment in Toby's trust. Almost seven months passed after the Supreme Court had decided In re Armour's Will before the present proceeding was initiated. Plaintiff's inaction is a clear case of laches, particularly since, as earlier stated, she, through her competent counsel, was as fully informed of defendants' taking of income commissions, first as executors and then as trustees, as her sister Toby.
Estoppel is also present, for defendants' affidavits filed in support of their motion for summary judgment showed that the income commissions allowed them have long since been disbursed and distributed, and taxes thereon paid, all in reliance on plaintiff's failure to make timely objection to the *129 payments of the commissions and in reliance upon the judgments approving and allowing such payments. These affidavits went uncontradicted.
The Chancery Division judgment is affirmed.