104 N.J. Super. 530 (1969)
250 A.2d 603
WILLIAM BAUER, AN INFANT, BY HIS GUARDIAN AD LITEM, THEODORE BAUER, AND THEODORE BAUER AND ELSIE BAUER, PLAINTIFFS,
v.
ALEX T. GRIFFIN, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided February 14, 1969.
*532 Mr. Michael A. Cohan for plaintiff (Mr. Edwin A. Kolodziej, attorney).
Mr. William T. McElroy for defendant (Messrs. Pindar, McElroy, Connell & Foley, attorneys).
*533 FRITZ, J.S.C.
William Bauer, the infant plaintiff herein, moves to vacate an order approving settlement, pursuant to R.R. 4:56A, on which judgments totalling $125,000 were entered in 1963 after a hearing.
On October 6, 1962 William Bauer, then 16 years of age, was walking on or near a public road when he was struck by an automobile operated by defendant. Because the matter was settled, the facts surrounding the accident do not appear of record. That some question with respect to these facts does exist is indicated by the respective statement of facts and counterstatement of facts submitted with the briefs on this motion. In the former, the allegation appears that defendant "veered off the road, striking Billy," while in the latter it is said, "There was some indication that William Bauer was struck * * * somewhere in the right hand traffic lane * * *." In the transcript made at the time of the approval of the settlement, the late Judge Mills commented: "The Court realizes that there are grave questions of negligence and grave questions of contributory negligence."
There is no question that the consequent injuries were extraordinarily severe, not the least of which was deep brain damage. Nor does it appear to be disputed that William Bauer went into immediate coma which persisted through and after the approval of the settlement on August 20, 1963.
On February 5, 1963 Theodore Bauer, father of William, instituted suit as guardian ad litem against defendant for personal injuries said to have resulted from the accident. William's parents also sued individually for their consequent damages. Defendant's insurance company settled all claims for $125,000, and on August 20, 1963 Judge Mills granted the application for approval of the settlement. In the interim there had been preparation for trial.
We are advised in the counterstatement of facts appearing in defendant's brief in opposition to the motion that:
"In the course of preparation for the case, the defense attorneys deposed the parents of the boy, had a neurological examination and employed other discovery devices. More particularly, on May 3, 1963 *534 Theodore and Elsie Bauer, the parents of William, were deposed, the testimony was recorded and the transcript was reviewed by Judge Elden Mills. Unfortunately, no transcript of the deposition is in existence today. Due to passage of more than five years, the Court's copy has been destroyed; defense counsel's copy has been destroyed along with the entire defense file; and the stenographer's notes have been destroyed."
Judge Mills, since deceased, made reference at the hearing to having had "the benefit * * * of reviewing the depositions of some of the parties to this matter, which was [sic] held on May 3, 1963."
On August 16, 1963 there was a pretrial conference before Judge Mills. The transcript of the hearing reveals that Judge Mills had "the benefit of extensive discussions with counsel concerning the possibility of an amicable settlement" both at the time of this pretrial and on the morning of the hearing.
Mr. and Mrs. Bauer and Dr. Ernest S. Matthews, the "attending physician" of William Bauer, were the only ones to testify at the hearing.
Mr. Bauer testified to the composition of his family, and to William's age. He stated that as a result of injuries which his son sustained in an accident on October 6, 1962, young William had been taken to a hospital unconscious, and that he had remained in the hospital in an unconscious state ever since. At this point in the testimony, the following appears:
"Q And you are aware of the fact that your son has been critically injured, are you not? A Yes, that's right."
Mr. Bauer said that accrued expenses approximated $30,000 and were continuing at the rate of about $100 a day. He acknowledged a complete awareness of the actions which had been instituted and their purposes, and of his position as guardian ad litem for William. He said that he had been made "fully familiar * * * with all of the circumstances surrounding this particular case." Then:

*535 "Q You are now in court for the purpose of accepting a settlement in this case. A Yes.
Q You are aware of that. A Yes.
Q And that settlement which has been offered and accepted is $125,000. A Right.
Q You are aware of that. A Yes.
Q Have you carefully discussed this matter with your wife and other members of your family? A Yes.
Q And are you satisfied that that sum is fair, just and reasonable under all of the circumstances? A Yes.
Q Has your attorney, meaning myself, explained to you all questions concerning this matter? A Yes.
Q Is this acceptance of the offer of settlement of your own volition, without any outside influences? A Yes.
Q Are you aware of the fact that upon the acceptance of this settlement of $125,000 that regardless of the outcome of your boy's injuries or in the event that he may die that no further sums of money will be paid to you concerning this case? A Yes.
Q You fully understand that. This is a full and final settlement. A Right.
Q Of all claims which arose out of this entire transaction. A Yes."
At this point a discussion was had off the record, after which two further questions were asked on direct examination.
"Q Now, as a result of this settlement, Mr. Bauer, it is anticipated that additional expenses will be incurred during the lifetime of your infant son and under the circumstances it was agreed that a settlement should be effected in two parts, one of which was to be for the benefit of your son for the injuries sustained to him and the other for the benefit of you and your wife as a result of damages and moneys expended in his behalf, and in that regard $65,000 has been set aside for the entry of a judgment in behalf of your son William and $60,000 in behalf of you and your wife for such moneys expended. Are you satisfied with that distribution? A Yes.
Q For yourself, for your wife and for your infant son? A Yes."
There was no cross-examination. The court inquired:
"THE COURT: Do you want me to approve it, Mr. Bauer? THE WITNESS: Yes."
*536 Mrs. Bauer then testified as to her awareness of the accident, her son's continuing unconscious condition, and the fact that his injuries were of a serious and critical nature. She confirmed her husband's estimate of the expenses. At this point the following questions and answers occurred:
"Q And you heard the questions concerning the settlement of this case for $125,000 to be distributed in the manner which was stated earlier? A Yes, I did.
Q And you heard. Are you satisfied with such a settlement? A I am. * * *.
Q And you are fully satisfied with this settlement, that it is just and reasonable? A Yes."
She expressed satisfaction with the legal fees which were agreed upon.
The entire cross-examination was comprised of four questions. We believe their import is significant.
"Q Mrs. Bauer, you understand that should the Court approve this settlement that has been proposed to the Court that regardless of what may occur in the future nothing further can ever be done by way of any claim? A Yes.
Q That the proceeding today is to completely end this matter. A Yes.
Q Regardless of future outcome? A Yes, I understand.
Q And knowing that you are satisfied to ask the Court to approve the settlement as proposed. A Yes."
Dr. Matthews, whose qualifications were stipulated, then testified that he was the attending physician "concerning the injuries sustained to William Bauer on October 6, 1962." He said that he had continued to treat the infant plaintiff, and that he was familiar with the history of the case.
When asked for his opinion of the severity of the injuries, his diagnosis and his prognosis, the following appeared:
"A This boy was admitted, as has been in testimony earlier, in a state of coma. At that time our clinical diagnosis was that of an acute subdural hematoma, plus injuries to the deeper brain structures, namely, the thalamic structures and the structures that connect the higher centers with the lower reflex centers of the brain.
*537 Following correction of his airway he was taken immediately to the operating room where burr holes, or trephination, was carried out and an acute subdural on the right was evacuated. The brain was also punctured in an attempt to rule out the existence of an intercerebral hematoma that might in some way help his condition.
This was not the case. Following the closure of the wounds and the closure of the laceration that had also been sustained during this boy's injury he was placed in refrigeration for approximately two weeks, which is the accepted method of treatment. Since that time he has been kept on intravenous and living tube feedings.
He has continued a downhill course. He has never regained consciousness and I would say his prognosis and outlook is poor or ominous.
Q His prognosis is grave? A Very grave.
Q His life expectancy  that's uncertain, is it not, Doctor? A It certainly is.
MR. GOULD: No further questions.
MR. McELROY: I have no cross-examination, sir.
THE COURT: That's all, Doctor.
MR. GOULD: That's the case, your honor."
Mr. McElroy, on behalf of the defendant, offered the report of Dr. Howard E. Medinets, the examining physician for the defendant, which the court found to be "substantially the same as the testimony of Dr. Matthews." Dr. Medinets' report concluded as follows:
"REMARKS: This patient suffered cerebral lacerations and contusions as a result of the accident. Deep brain structures were irreversibly damaged. His survival to this time has resulted only on account of excellent neurosurgical and nursing care. His brain functions on a reflex level. There is no consciousness. The prognosis is grave."
Affidavits were filed in connection with the instant motion on behalf of both the infant plaintiff and defendant. An affidavit of the parents of William Bauer and of one Dr. John F. Butterworth, said to be the treating physician "for William Bauer, age 21," revealed, and it is apparently beyond dispute, that William has survived, that he has not yet recovered from the severe brain damage resulting from the accident of October 6, 1962, and that he is unable to care for himself or to manage his own affairs. The parents' affidavit *538 avers, and we accept as factual, that at the time of settlement the medical bills were in excess of $30,000 and were continuing at the rate of about $100 a day. This is substantiated by the testimony of Mr. and Mrs. Bauer at the hearing, reproduced above. Their present affidavit also avers, and we accept as factual, that the infant's medical bills to date exceed $90,000. This affidavit also claims that, because of the cost, the parents have had to discontinue the extensive physical and speech therapy that the infant was obtaining and that he does, in fact, need. This statement is not controverted by any affidavit of defendant, and no reason appears to disbelieve it.
The parents claim in their affidavit that:

"* * * * * * * *
3. At the time of the settlement in this matter in August of 1963, both of us had been informed by all of the doctors who were taking care of Billy that, in their opinion, he was definitely going to die and that there was no chance that he would live.
4. We were also informed by our attorney at that time that if Billy did die the case would be worth a lot less because of the fact that we could only recover for any actual financial loss that we sustained.

* * * * * * * *.
6. Although we wanted the insurance company to continue paying all of Billy's medical bills without settling the case, they refused to do so and insisted that we take one lump sum at that time if we wanted to settle.
7. Although we did settle the case while Billy was still unconscious and with the belief that he was going to die, Billy did in fact regain consciousness and he required continued medical care for an extended period of time and he is now living at home with us."
In this respect, the affidavit of one Robert J. McLaughlin, who "was involved in settlement attempts * * * through William T. McElroy, Esquire, on behalf of defendant" as a representative of the defendant's insurance company, submitted by the defendant, alleges the following:

"* * * * * * * *
4. In the above-entitled action a settlement offer of One Hundred Twenty Five Thousand ($125,000.00) Dollars was made on August 19, 1963 for the following reasons:

*539 (a) the ultimate determination of liability against the defendant was uncertain because of evidence of contributory negligence;
(b) the injury suffered by William Bauer to his brain was permanent;
(c) the special medical expenses to that date amounted to about $30,000.00;
(d) William Bauer at the time of the accident was a sixteen year old unemployed male. If he died a short time after August, 1963 without having regained consciousness, the ascertainable damages probably would not have exceeded $40,000.00. On the other hand, if he survived and regained consciousness, ascertainable damages for such an injury would have been substantially greater than $40,000.00; and,
(e) In view of the uncertainty with regard to liability, and more importantly to the amount of probable damages, the defense made the above-described offer which was accepted.
5. The defense did not enter the settlement with the firm expectation that William Bauer faced imminent death."
It should be noted that these latter contentions of the parents and of the insurance company are not necessarily inconsistent with each other, and both may be accepted as factual. We question the relevance of self-serving declarations of intention, not claimed to have been communicated as between the parties, appearing five years after the fact.
The infant plaintiff now moves to set aside the judgment, essentially on three grounds: first, that mistake as to the nature of the injuries resulted in an improvident judgment; second, that the court in approving the settlement made insufficient inquiry into the facts surrounding it; and third, that a conflict between the interests of the father as an individual plaintiff and as guardian ad litem for the infant fatally infects the judgment. His application is bottomed on "mistake, neglect, and newly discovered evidence," in addition to particular reliance on R.R. 4:62-2(f).
The questions thus presented appear not to have been heretofore decided by our appellate courts. Before we reach these, however, we are confronted with a procedural problem of some magnitude.
R.R. 4:62-2 invests the court with the power, in an exercise of sound discretion, to "relieve a party * * * *540 from a final judgment * * * for the following reasons: (a) mistake, inadvertence * * *; (b) newly discovered evidence which would probably alter the judgment * * * and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:61-2; * * * (f) any other reason justifying relief from the operation of the judgment or order." It is said in the same rule that a motion invoking such relief shall be made within a reasonable time and in cases of subsections (a) and (b) "not more than 1 year after judgment."
R.R. 4:62-2 is a rule addressed to the sound discretion of the trial court, guided by equitable principles. "The rule is designed to afford a remedy in the rare situation in which for some equitable reason a judgment or order pronounced by a competent court should not be enforced." Greenberg v. Owens, 31 N.J. 402, 405 (1960). The discretion of the trial court is not unlimited. For instance, "mistake," within the purport of this rule, has been held not to embrace trial errors. Hodgson v. Applegate, 31 N.J. 29 (1959). An all-encompassing definition of "mistake" does not appear in reported cases.
It would appear from a reading of the plain language of 4:62-2 in the light of the Hodgson decision that plaintiff's motion is far out of time insofar as it is brought under subsections (a) and (b) of the rule. However, a number of considerations convince us that we should determine the whole matter on its merits and as though the rule had been timely invoked.
First, despite the fact that the "other reason[s]" of subsection (f) are said to be exclusive of "mistake" as specified in subsection (a) (Doyle v. Chase Manhattan Bank, 80 N.J. Super. 105 (App. Div. 1963), certification denied 40 N.J. 508 (1963)), it is conceivable that mistake, other than trial error, might be sufficiently egregious in any given case so as to qualify as an "other reason"; should, under those circumstances, qualify for the policy considerations which permit subsections (d), (e), and (f) of the rule to be applied *541 without time considerations beyond reasonableness; and should, therefore, not be limited by the one-year provision. Accord Simons v. Schiek's, Inc., 275 Minn. 132, 145 N.W.2d 548 (Sup. Ct. 1966) (but note dissent which believes the "other reason" clause to be reserved for "exceptional situations." Minnesota's civil procedure rule relating to vacating judgments is like that of New Jersey and the federal practice.) Second, the meaning of "mistake" as used in the rule not having been definitively determined, it might be said in the context of the present matter to have been misinterpreted even by astute counsel, particularly where, as here, the infant plaintiff has just attained his majority. Hodgson v. Applegate, supra. To impose upon plaintiff the devastation of the one-year limitation or not, according to whether his rather unique situation is labelled a "mistake" or an "other reason," or to require from him a semantic election, seems in the circumstances of this particular factual complex neither wise nor just. Third, the present matter in our view involves novel questions of substantial public importance and, therefore, ought not to be avoided on a technical procedural ground. Compare Ciocca v. Hacker, 4 N.J. Super. 28, 33 (App. Div. 1949), where the "ever-broadening policy against the procedural frustration of just determinations between parties on the ultimate merits" is said to be a wholesome one.
In any event, the application for relief under subsection (f) removes a one-year limitation by the express terms of the rule and limits the time only in terms of reasonableness. While we have substantial question as to whether a delay of five years under the circumstances is reasonable, we are loath to avoid the determination of the significant questions presented on this basis. In connection with this latter consideration, it should be noted that R.R. 4:62-2 is substantially the same as Federal Rule of Civil Procedure 60(b), as amended. "It is therefore proper to draw on the experience of the federal courts with that rule to aid in the solution of comparable problems that arise under *542 our rule." Hodgson v. Applegate, supra, p. 35. Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949), cited in Hodgson, indicates that the residuum in the "other reason" clause is to provide an appropriate procedure for the accomplishment of justice. See Hogan v. Hodge, 6 N.J. Super. 55 (App. Div. 1949); Wilford v. Sigmund Eisner Co., 13 N.J. Super. 27 (App. Div. 1951).
Accordingly, we turn first to the matter of the alleged mistake. Plaintiff insists that all concerned believed that death was imminent for the infant plaintiff, and that this mistaken belief, proved by "newly discovered evidence" (i.e., the infant in fact lived), justifies relief from the judgment.
No New Jersey cases relating to the reopening of a judicially approved infant settlement on these grounds appear.
Plaintiff argues from analogy with the release cases, that since "mutual mistake" will serve to avoid the bar of a release, it should serve to support the vacation of a judgment. There is little solace for plaintiff in these cases for they consistently hold that absent fraud or overreaching (both of which are notably absent in the instant matter), a misconception of the seriousness of the injuries alone is not the type of mistake which will avoid a release. Raroha v. Earle Finance Corp., Inc., 47 N.J. 229 (1966). See Aiello v. Myzie, 88 N.J. Super. 187 (App. Div. 1965), certification denied, 45 N.J. 594 (1965). Cf. Acevedo v. City of New York, 15 A.D.2d 899, 225 N.Y.S.2d 584 (App. Div. 1962), cited by plaintiff.
We believe the sound and extant rule is succinctly stated in Spangler v. Kartzmark, 121 N.J. Eq. 64 (Ch. 1936):
"* * * in order to invalidate a release on account of mutual mistake, the mistake must relate to a past or present fact material to the contract and not to an opinion respecting future conditions as a result of present facts." (at p. 68)
*543 It is to be observed that Spangler involved a known physical injury concerning the future effects of which all were incorrect. The factual resemblance to the matter here under consideration is striking.
The reason for the rule is amplified in Reinhardt v. Wilbur, 30 N.J. Super. 502 (App. Div. 1954):
"The question to be determined is whether a duly executed general release may be invalidated upon the ground of mutual mistake of fact merely because an injury subsequently becomes more serious than the releasor believed it to be, or because she sustained injuries of which she was not aware, at the time of the execution of the release. The very suggestion of invalidation for such cause is contrary to firmly imbedded principles of law. We cannot shut our eyes to the realities of everyday practice. Persons involved in accidents or their representatives carry on and conclude negotiations precisely because there is uncertainty as to the extent of injuries or liability or both, and because of the uncertainty as to the outcome of any ensuing litigation. A general release duly executed and fairly obtained is a complete bar to further recovery for injuries sustained. Otherwise, the floodgates would open and not only persons like the plaintiff would seek avoidance, but also those who had paid substantial sums if supposedly serious injuries later proved to be minor." (at p. 505)
Irrespective of this, the infant plaintiff has brought to our attention a respectable body of opinion elsewhere holding that an erroneous view of the nature of the injuries at the time of the entry of judgment or the signing of a release is reason enough to set that judgment aside or bar the release as a defense. Elsen v. State Farmers Mutual Ins. Co., 219 Minn. 315, 17 N.W.2d 652 (Sup. Ct. 1945); Wilson v. Davidson, 219 Minn. 42, 17 N.W.2d 31 (Sup. Ct. 1944); Larson v. Stowe, 228 Minn. 216, 36 N.W.2d 601, 8 A.L.R.2d 455 (Sup. Ct. 1949); Clark v. Gronland, 221 Minn. 505, 23 N.W.2d 169 (Sup. Ct. 1946); Simons v. Schiek's, supra; Ranta v. Rake, 91 Idaho 376, 421 P.2d 747 (Sup. Ct. 1967); Casey v. Proctor, 59 Cal.2d 97, 28 Cal. Rptr. 307, 378 P.2d 579 (Sup. Ct. 1963) (release case; local statute involved); Clancy v. Pacenti, 15 Ill. App.2d 171, 145 N.E.2d 802, 71 *544 A.L.R.2d 77 (App. Ct. 1957); Denton v. Utley, 350 Mich. 332, 86 N.W.2d 537 (Sup. Ct. 1957).
None of these cases is apposite. In each of the cited cases the injury which manifested itself subsequent to the judgment or release was previously unknown and different anatomically from those recognized or realized at the time of the judgment or release.
The fact is that at the time of entry of judgment here there was no mistake regarding the nature of the injuries. It was abundantly clear to all who participated that the infant plaintiff sustained severe and serious cerebral lacerations and contusions whereby the deep brain structures were irreversibly damaged. The very certainty of the nature and seriousness of the injuries paved the way for plaintiff's present contention that the prognosis for almost immediate death was such a foregone conclusion that the judgment should be set aside because of the mistake, not with regard to the nature of the injuries, but in the conclusion which was drawn.
We do not agree. In the first place, the record does not support the argument. There is no question but that the prognosis was a dire one. No medical degree is needed to understand from the most general description of the injuries sustained that the future for young Bauer held no promise. But it is to be noted as well that in the area of life expectancy, where medical opinion was necessary, no opinion of imminent death appears of record. When Dr. Matthews was asked, "His life expectancy  that's uncertain, is it not, Doctor?", he replied, "It certainly is." As much to be presumed from the opinions which were expressed such as "poor or ominous," and "grave," is the likelihood of continued life, if only from the absence of such typical expressions as "terminal."[*]
*545 To speculate, after five years, upon considerations dehors the record, or to attribute meanings to words beyond their reasonable import, would seem to be reaching for a result. While in a given case justice and fairness might so require, we incline to the opinion that this is not such a case. Beyond the obvious premise that such speculation might be in error, it would have to be undertaken at the expense of the important policy considerations inherent in the sanctity of final judgments, and at a risk of unfairness to the defendant whose substantial voluntary payment for his final judgment is unquestionably entitled to some regard. An unthinkable alternative is that we now, at this late date, become involved in the collateral determination, as a question of fact, whether the doctor meant "terminal" when he said "very grave." Or worse, that we travel in quest for that which existed only in the minds of the various persons concerned.
Bennett v. Ryan, 206 Iowa 1263, 222 N.W. 16 (Sup. Ct. 1928), cited by plaintiff, also seems inapposite with respect to his contentions relating to mistake regarding the nature of the injuries. In other respects Bennett contravenes plaintiff's argument.
Even were plaintiff's hypothesis accepted, i.e., that everyone concerned anticipated almost immediate death, the fact that all were wrong in their "opinion[s] respecting future conditions as a result of present facts" (Spangler v. Kartzmark, supra) does not, in our opinion, support plaintiff's application. Reinhardt v. Wilbur, Aiello v. Myzie, both supra. To permit judgments to stand or fall according to an examination in the bright noonday sun of hindsight invokes policy considerations far less meritorious than those which augur for finality by judgment. Finality of judgments and an end to litigation are said to be objects of public policy and sound jurisprudence. Paradise v. Great Eastern Stages, Inc., 114 N.J.L. 365, 367-368 (E. & A. 1935); State by State Highway Com'r. v. Speare, 86 N.J. Super. 565, 585 (App. Div. 1965). While fairness and justice are lodestars without peer, the subordination of finality in a judgment to *546 considerations of the way things actually worked out seems warranted only for the most compelling reasons. We do not believe this to be such a case.
It is at once apparent that to hold otherwise would potentially compromise every judgment entered on a settlement of an infant's claim. The judgment would be binding only so long as things went as they were expected to go. We believe that the requirement of approval by the court is some acknowledgment of the hard fact that risks exist, and that they are to be objectively assayed toward the salutary end that the proposed solution be approved or disapproved, and if approved, the matter be finally put to rest.
Other cases cited by plaintiff concern themselves with fraud, misrepresentation, overreaching, lack of competent advice, lack of knowledge or understanding by the court, and so forth. Picciano v. Duluth, M. & N. Ry. Co., 102 Minn. 21, 112 N.W. 885 (Sup. Ct. 1907); In re Clark's Estate, 318 Mich. 92, 27 N.W.2d 509 (Sup. Ct. 1947); Missouri-Kansas-Texas R. Co. of Texas v. Pluto, 138 Tex. 1, 156 S.W.2d 265 (Sup. Ct. 1941); Rebic v. Gulf Refining Co., 122 Pa. Super. 149, 186 A. 236 (Super. Ct. 1936). None of these elements is here present. All parties, with full knowledge of the nature of all injuries to an extent where the matter had been pretried and a trial calendar call date a month hence had been set, were adequately represented by competent counsel. Full disclosure was made to the court. The judge gave the matter serious, studied, and conscientious consideration and acted accordingly. Nor is there any complaint even now in these directions. Plaintiff contends in this respect only that he is entitled to the relief sought because the known injuries did not result in the immediate death of the infant plaintiff.
The argument that the court made "insufficient inquiry" into the circumstances surrounding the settlement is, in our view, so patently without merit that it requires little comment. Judge Mills required the testimony of the attending physician (compare R.R. 4:56A(c) which permits *547 such proof by affidavit), who graphically described, for instance, the complex brain surgery which was performed, and his subsequent treatment, including the placing of the infant plaintiff in refrigeration for two weeks. Plaintiff now complains that "the Court made no inquiry as to whether or not Dr. Matthews was any more than a general practicing physician." In addition, Judge Mills read and considered the report of a physician who examined for the adverse party, which he found to be "substantially the same" as the testimony of the treating doctor. Almost six years later, criticism is levelled at the court's alleged failure to examine hospital records or the reports of "consulting" physicians. Judge Mills reviewed depositions, pretried the action, and "had the benefit of extensive discussions with counsel." That he was entirely conversant with all the circumstances can be gleaned not only from his participation as noted above, but from his comments in approving the settlement where he said first, "* * * being mindful of the condition of the defendant [sic: obviously he meant plaintiff] * * *" and later, "* * * mindful of this situation * * *." We believe Judge Mills' "inquiry" was completely sufficient. His thoroughness in this regard produces confidence in the soundness of the exercise of his discretion in approving the settlement.
Finally, the infant plaintiff now contends that a conflict of interest between his interests and those of his parents, one of whom was the infant's guardian ad litem, justifies the reopening of the judgment. Were this postulate sound, an approval of settlement would be vulnerable in every infant's action in which the guardian ad litem was one of the parents and which involved in part medical expenses for which the parent was at least initially responsible (the usual case). It seems apparent that the summary procedure set forth in R.R. 4:56A bespeaks an intent to provide an inexpensive, expedient method for the consideration of the settlement of infant's claims which might well be totally frustrated by the requirement for a strange and compensated guardian ad litem in the typical case.
*548 In a consideration of whether R.R. 4:30-2 (or R.R. 4:56A) does include such a requirement, it should be noted that R.R. 4:30-2(b) (3) contains no limiting conditions with relation to a conflict of interests such as those found in R.R. 4:30-2(a), (b) (1) and (b) (2). The fact that a guardian ad litem may be appointed simply "upon motion of the court" indicates a reliance upon the discretion of the Judge to weigh such matters as conflicts of interest, among other things, at least in his selection of a guardian ad litem. While the authority of this subsection (R.R. 4:30-2(b) (3)) was not here required, it would seem reasonable that the same reliance is inherent in R.R. 4:56A and is expressly invoked by the purpose of that Rule in mandating the approval of the Judge before any settlement may harden into a judgment.
In sum, after a consideration of both Rules, and with respect for the ends to be achieved including substantial justice, we conclude that circumstances may and do exist where conflicts of interest, normally abhorred in the law, when properly supervised, are lesser evils than some of their alternatives. The injunction of the law is not against conflicts, but against conflicts which disserve the interests of justice. Compare, Canon 6, Canons of Professional Ethics of the American Bar Association.
We are confident from a review of the record that the alleged conflict so apparent to the moving party here was equally apparent to Judge Mills and was competently regarded and considered. This is all that the law requires toward the end of achieving the significant purposes of R.R. 4:56A.
The infant plaintiff now argues, apparently from the springboard of his true assertion that he was unconscious at the time of the settlement and had been so ever since the accident, he "could not and did not benefit by the settlement * * * while he was still lying unconscious in Morristown Memorial Hospital." While some argument is advanced that his parents were being throttled with great medical bills, *549 and thus might have been thought to be particularly anxious to settle the case in order to secure their own economic position, no argument is advanced for the fact that "no one really considered the interests of Billy" and that he "was the one person involved who could not benefit by his case being settled" beyond those bald statements. While no proof appears in this regard, it might as easily be speculated that it was the availability of substantial hard cash which made the maintenance of the infant plaintiff's life possible. As with the question of injuries, it would seem that the vital issue is whether Billy's interests were then considered, not whether such consideration and conclusions worked out as was anticipated. There is no proof whatsoever that Billy's interests were not considered in 1963. The recriminations of counsel six years later, predicated upon that which in fact occurred subsequent to the determination, do not derogate against our conviction that if, as counsel argues, Billy's interests were not considered by the guardian ad litem, they most certainly were considered by the Court.
We are satisfied that the Court fully and faithfully performed its function pursuant to Rule 4:56A despite our deep human compassion elicited by the eventualities.
The soundness of all the foregoing may be tested by examining the alternative to Judge Mills' approval of the settlement. The matter would have gone to trial and a jury would have considered essentially the same evidence as was available to the Court on the hearing below. We have no doubt that their verdict would have remained immune from any of the attacks here launched, although the same arguments might well have been made. We fail to see any policy considerations in the circumstances here presented, including the substantial sum paid, sufficient to distinguish between the finality to be accorded in either of the two events.
The motion is denied. An order shall be presented consented to as to form or settled on notice.
NOTES
[*] It is to be noted that the "tables of mortality and life expectancy" were included as among the legal issues under paragraph 7 of the pretrial order of August 16, 1963.