IN THE MATTER OF THE ESTATE OF CHARLES F. SEABROOK, DECEASED.

THE BANK OF NEW JERSEY AND LEO P. DORSEY, TWO OF THE EXECUTORS UNDER THE WILL OF CHARLES F. SEABROOK, APPELLANTS, v. WESTMINSTER CHOIR COLLEGE, BOARD OF EDUCATION OF UPPER DEERFIELD, PRINCETON THEOLOGICAL SEMINARY AND THE DEERFIELD PRESBYTERIAN CHURCH, CROSS-APPELLANTS-RESPONDENTS, AND BELFORD L. SEABROOK, JOHN W. SEABROOK, *ET ALS.,* CLARENCE B. McCORMICK, ROBERT A. SIDUR AND DONALD G. McALLISTER, REMAINING EXECUTORS UNDER THE WILL OF CHARLES F. SEABROOK, *ET ALS.,* RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted November 5, 1973—Decided February 25, 1974.

Before Judges CONFORD, HANDLER and MEANOR.

*Messrs. Hyland, Davis & Reberkenny,* attorneys for appellants The Bank of New Jersey and Leo P. Dorsey (*Mr. William F. Hyland,* of counsel).

*Messrs. Archer, Greiner and Read,* attorneys for cross-appellants-respondents Westminster Choir College and Board of Education of Upper Deerfield (*Mr. Peter E. Driscoll,* of counsel).

*Messrs. Meyner and Wiley,* attorneys for cross-appellants-respondents Princeton Theological Seminary and Deerfield Presbyterian Church (*Mr. Thomas D. Hogan,* on the brief).

*Messrs. Clapp & Eisenberg,* attorneys for respondents Belford L. Seabrook, as executors under the will of Norma Dale Seabrook, and John M. Seabrook and C. Courtney Seabrook, individually (*Mr. Alfred C. Clapp,* of counsel).

*Messrs. Richman, Berry, Ferren & Tyler,* attorneys for respondents Orlando, Holweiler & Yampell, Esqs., attorneys for the Estate of Charles F. Seabrook (*Mr. Grover C. Richman,* on the brief).

*Messrs. Crowell and Otten,* attorneys for respondents Patricia B. Otten *et al.*

*Messrs. Shapiro, Brotman, Eisenstat and Capizola, and Mr. Santo Salvo and Mr. Frank Ferry,* attorneys for respondents Clarence B. McCormick, Donald G. McAllister, Robert A. Sidur and South Jersey National Bank, as executors of the estate of Samuel P. Orlando.

*Messrs. Stryker, Tams & Dill,* attorneys for respondent Thelma Seabrook Sidur.

*Mr. David L. Horuvitz,* for respondents Belford L. Seabrook, individually and Charles F. Seabrook, II.

The opinion of the court was delivered by

CONFORD, P. J. A. D. These are appeals from that part of an order entered in the Chancery Division fixing executors' commissions on corpus and fees for counsel to the executors in the administration of the estate of Charles F. Seabrook, who died October 20, 1964. Certain of the appellants originally appealed also the denial by the court of a demand by income beneficiaries that earnings of a corporation wholly owned by the testator, C. F. Seabrook Company, be allocated to income of the estate rather than corpus. This issue has been settled pending the appeal. The remaining issues are:

(a) whether the commissions awarded to executors are excessive;

(b) whether such commissions are inadequate, and

(c) whether the counsel fees awarded to the attorneys of the executors are excessive.

The background of the matter may be stated as follows. The testator's principal asset at death consisted of all the shares of stock of the corporation named above ("company") and several subsidiaries thereof. The company owned 12,000 acres of land in Cumberland County, most of which was farmland under long-term lease for farming purposes to Seaman Brothers. The subsidiary companies operated housing consisting of several hundred units and a large horticultural nursery, both fairly profitable operations and well run under the salaried ($21,000 per annum) management of Donald G. McAllister, who is also one of the six executors of the estate. The other executors are Bank of New Jersey (formerly Camden Trust Company); Samuel P. Orlando (until his decease in the Spring of 1972), who was the company's attorney at $5,000 per annum and served also as counsel to the estate; Clarence B. McCormick, a banker, who also became president of the company after the testator's death at a salary of $9,000 per annum; Leo P. Dorsey, a New York

lawyer, and Robert A. Sidur, son-in-law of Mr. Seabrook, who received a salary of $6,000 as head of the housing subsidiary but whose principal occupation was elsewhere. These men also served during the administration as the board of directors of the company.

There was a contest over probate of the will by next-of-kin claiming fraud and undue influence by Mr. Orlando and Mr. Dorsey. After 2½ years of litigation the matter was settled by an increase of the distributive share of the widow and reduction of those of the several charitable beneficiaries.

The executors qualified as such about April 1967, after the will contest, and have continued as executors until the present time, but the active administration largely subsided in November 1971 when the corporate shares (inclusive of the subsidiary corporations) were sold in bulk for $9,000,000 net (free of brokerage), and the proceeds were converted into United States Treasury bills.

The executors sought corpus commissions of $922,455.38, or the maximum statutory rate of 5% for one executor and 1% for each of the five additional executors on corpus receipts of $9,224,553.83. *N. J. S. A.* 3A:10–2. The trial court allowed the mandatory 5% of the first $100,000 and 2½% of the remainder, and an additional 2% by reason of there being more than one fiduciary, or a total of $417,604.93.

The representatives of Mr. Orlando sought a counsel fee for his law firm of $300,000 and were allowed by the trial court $200,000.

I

*N. J. S. A.* 3A:10–1 provides that allowance of commissions on corpus in excess of $100,000 to testamentary fiduciaries "shall be made with reference to their actual pains, trouble and risk in settling the estate rather than in respect to the quantum of the estate." *N. J. S. A.* 3A:10–2 sets forth a maximum percentage of allowance on corpus over $100,000 coming into the fiduciary's hands: *i. e.,* 5%, and,

in addition, regardless of the amount of corpus, a maximum rate of 1% additional for each fiduciary in excess of one.

In *In re Bristle,* 138 *N. J. Eq.* 476 (E. & A. 1946), it was said in relation to the same statutory provision:

Obviously, the maximum commission was intended to be applied to administrations involving the maximum amount of trouble and risk. [at 477]

In that case the appellate court reduced an award of corpus commissions from $3\frac{1}{2}\%$ to $2\frac{1}{2}\%$, pointing out, among other things, that the estate had "for its size, entailed a simple administration". *Ibid.*

The foregoing thesis is the point of departure of the comprehensive guidelines set out by the Supreme Court in *In re Estate of Moore,* 50 *N. J.* 131 (1967), for determining corpus commissions of testamentary fiduciaries. It was there emphasized that "actual pains, trouble, risk and services rendered" is the principal factor by which the court determines what portion of the statutory maximum rate should be applied to the statutory base — *i. e.,* the gross estate received at inception plus gross receipts during the administration. *Id.* at 145. Thus, in deciding how much of the 5% maximum rate here allowable should be applied to the base of $9,124,553.83 — gross estate less $100,000 (assuming an estate with one executor), one must determine what degree of maximum "pains, trouble and risk" was experienced by these particular executors. If pains, trouble and risk here were average, neither high nor low, and no other depreciating factor were present, a rate of roughly half the maximum of 5%, or from $2\frac{1}{2}\%$ to 3%, would be appropriate.[1]

We conclude that pains, trouble and risk here were average — *i. e.,* neither high nor low but moderate. We agree with the finding of the Chancery Division judge that "for the

---

[1] We have in mind that even in an estate of minimal pain, trouble and risk a rate of at least 1% would ordinarily be allowable.

most part the services rendered were * * * a caretaking operation". Apart from the care and responsibility involved in the major decision to sell off the company shares in 1971 and in the consummation of that transaction, running this estate involved the routine matters of attending to tax returns, including settling a dispute over valuations, collecting income and paying expenses, and the other general miscellany of an uncomplicated administration. Payment of taxes and the expenses of a prior will contest did, however, involve arranging for loans from the company to the executors, retiring some of the corporate stock and effecting a loan from a savings and loan association, but these matters presented no great difficulties.

There was also some oversight of the operation of the business of the company, but the *executorial* trouble in that regard was fairly nominal in view of the facts that the business was well run by McAllister, McCormick and Sidur in their separately paid capacities as employees and officers of the company, and that at least its routine legal problems were being handled by Orlando in his capacity as paid counsel for the company.

There is no doubt that good judgment and care were exercised in respect of the final sale. But the great credit the executors argue is due them for having made that sale possible by refusing earlier offers to sell parts of the land is refuted by the fact that they had no real choice in the matter until August 1971, when the lessee of the bulk of the land failed to exercise its option for lease renewals which could have extended 15 years beyond 1972. The evidence in the case is uniform that this factor effectively blocked the chance of any earlier advantageous sale of the property prior to the expiration of the lease option. The best offers received by the executors previously were from 40% to 50% of the ultimate sale price of $9,000,000.

█ The appealing executors argue their allowance should reflect a reward for their efforts in having resisted the will contest and rejected inadequate overtures for settlement

thereof. We pass the point that this seems not to have been urged before the trial court. The contention is without merit. These fiduciaries had no responsibility in the estate until after the will contest, when they qualified, although the corporate fiduciary was one of two administrators *pendente lite* which were compensated for services as such, as was their counsel in that behalf. Two of the present individual executors were under attack for alleged fraud and undue influence in the matter of the will, and it was obviously to their personal interest to resist those charges. While there may be law in some other jurisdictions that it is the duty of an executor named in a will to defend and establish the will as against those who oppose its probate, see 95 *C. J. S., Wills,* § 324 at 158, no New Jersey authority is cited by the parties to that effect. Moreover, we do not discern that these six executors, in their capacity as named-in-the-will but not yet qualified fiduciaries, were parties to the will contest or represented therein. Under such circumstances they can be compensated in this proceeding only for services rendered after qualification as executors in this, not the *pendente lite* administration.

The appealing executors also complain of the trial judge's having allegedly depreciated his allowance for their services on the basis that there would be due them further corpus allowances when they were discharged as executors and assumed administration of the testamentary trusts. There was an allusion to the latter fact by the trial judge in his opinion but we doubt that it was more than a makeweight observation. Authority for the relevance of such a consideration may be found in *In re Bristle, supra,* 138 *N. J. Eq.* at 477. A sounder approach, however, would seem to have been reflected by *In re Hibbler's Estate,* 78 *N. J. Eq.* 217 (Prerog. Ct. 1910), aff'd o. b. 79 *N. J. Eq.* 230 (E. & A. 1911), wherein it was indicated that a judgment as to how much should be allowed as trustee should take into account what was previously allowed as executor. *Cf. In re Armour's Will,* 33 *N. J.* 517 (1960).

In any event, if the trial court's observation influenced the allowance, appellants will not have been prejudiced as that consideration will not affect our own determination as to what the award should be in this case.

It remains to be observed, relative to the factor of risk, that under the will the corporate fiduciary was relieved of any right or responsibility to (a) participate in any decision concerning any sale of the shares in the company, or (b) participate in decisions as to company management. It was also relieved of any liability in respect of loss caused by actions or defaults by the other executors in relation to the company.

Thus, on the basis of what has been stated, our conclusion that this was an average estate in terms of pains, trouble and risk to the executors in its administration should operate to reduce the 5% maximum corpus commission rate accordingly. We accept the trial court's determination of $2\frac{1}{2}\%$ as fairly reflective of the "average" factor for pain, trouble and risk presented. However, the trial court erred in not further reducing the commission rate to reflect the significant circumstance that the base of over nine million dollars in corpus receipts represents a value resulting substantially entirely from the effects of general real estate inflation upon the value as of the time the executors took over their administration in April 1967 — $2,000,000.[2] The executors have conceded this fact in the depositions.

In the *Moore case, supra,* it was pointed out:

\* \* \* The time during the administration when the value increased has to be taken into account and where the increase has existed only during a fraction of the period, the rate should be calculated downward accordingly. In other words, an increase in value at the late stages of an administration should not be related back to inception,

2The executors filed returns for inheritance tax purposes showing a valuation of $2,000,000 as of the time of the testator's death in October 1964. This figure was compromised with federal tax auditors at $3,000,000. The parties, including appellant executors, have assumed a true value of $2,000,000 as of the time the present administration began, and so will we.

and it is the accountant's obligation to present to the court the facts with reference to the time and amount of value increases claimed. Likewise, it has become quite generally and soundly accepted that where a substantial increase in value is in no sense attributable to the efforts of the fiduciary, but only to the universal effects of inflation, '* * * the rate of commission allowed should * * * be lower than if calculated upon inventory values'. *Appleby v. Appleby, supra* (140 *N. J. Eq.*, at p. 12). [50 *N. J.* at 147; footnote omitted].

We do not interpret the two thoughts thus expressed as calling for two separate and distinct adjustments downward of the commission rate, but rather as representing two approaches to the rationale for adjusting the rate downward once. In other words, a fiduciary who begins administration of an estate then valued at $2,000,000 which by inflation alone rises to a value of $9,000,000 by the termination of the administration should be subject to a fair adjustment downward of the otherwise proper rate to be multiplied against the end-value of $9,000,000 because he has not borne the responsibility of custody and administration of that much of a valuation over the whole period of his administration. The implication of the latter part of the excerpt quoted from *Moore, supra,* is that he might be exempt from such a downward rate revision if his managerial acumen, rather than sheer inflation, were creditable for the rise, or might, alternatively, be allowed credit therefor in the fixing of the "pains, trouble and risk" factor.

There being no evidence as to just when and at what rate the valuation rose, we assume it rose at a uniform rate during the five years of the administration and that therefore the average value over the five year period was $5,500,000 ($9,000,000[3] plus $2,000,000 divided by two). Since $5,500,000 is roughly 60% of $9,000,000, there ought theo-

---

[3] We are using the $9,000,000 figure rather than the statutory base of $9,124,553.83 for averaging purposes since the inflationary influence applies only to the land value, and land was almost the only component of the corporate assets which in effect were the subject matter of the sale of stock for $9,000,000.

retically to be a revision downward by 40% of whatever rate would otherwise be properly applied to the base. We have already determined above that after application of the "pains, trouble and risk" factor the 5% maximum rate should be reduced to 2½%. Reducing that rate to the extent of 40% thereof would leave the tentative effective rate (on the assumption of a one-executor estate) at 1.5%.

Theoretical evaluations may not always be just ones, however. We have decided that the 1.5% rate arrived at above should be adjusted to 1.75% on a subjective review of the entire record of the performance of the executors over the five-year period involved and all elements properly to be considered in relation thereto, including the management of the successful final sale.

Appellant executors have argued they should not be dealt with adversely because of the valuation inflation factor in view of the fact that only by holding on to the bulk of the land until the nine million dollar sale opportunity came along was it possible to realize on it. However, we have already indicated that the executors had no real choice but to wait until a determination of whether the renewal option on the lease of the farmland would be exercised. In any case, the prudent holding of property for a better price seems to appertain more appropriately to the fixing of the pains, trouble and risk factor than to mitigation of the rate adjustment for the inflationary rise called for by *Moore, supra*. There is therefore, for both these reasons, no basis to mitigate the adjustment for the inflation factor.

## II

The Chancery Division allowed the executors an additional 2% on corpus by reason of there being more than one fiduciary. The statute allows a maximum of 1% additional on total corpus per fiduciary in excess of one, so that the potential additional rate for the six executors here was 5%, *N. J. S. A.* 3A:10–2, subd. a(3), which was the rate requested by them.

We can see no reason, as a matter of logic and principle, why the same considerations we deemed appropriate in scaling down the maximum rate of 5% applicable to a one-executor estate (as to excess over $100,000) should not also apply, and to the same degree, in determining what part of the maximum rate of 5% for the additional five executors should be allowed in respect thereof. Nor has any such reason been suggested by the parties. We consequently fix the same rate of 1.75% as the allowable rate for the stated purpose.

## III

The trial court allowed a counsel fee of $200,000 for legal services rendered to the executors by Mr. Orlando and his firm. We are constrained to find the allowance excessive to the extent of constituting a mistaken exercise of discretion as (a) not reflecting the fact that Mr. Orlando received $25,000 in retainers for legal work for the company,[4] as distinguished from the executors; (b) placing too high a value on legal services to the executors, and (c) allocating to value of legal services, as opposed to value of services as executor, Mr. Orlando's leadership and coordination of the activities of the executors.

Mr. Orlando wore a number of hats in relation to the subject matter of this administration. He was (1) executor, perhaps the most active of the six; (2) counsel to the executors; (3) a member of the board of directors of the company, and (4) attorney for the company. The affidavit of services he filed below reflects services in all four capacities, in many instances not clearly defined. As already noted, Mr. Orlando was paid a $5,000 annual retainer over a period of five years for services as attorney to the company — a fact not noted in the affidavit of services nor mentioned in con-

---

[4] Mr. Orlando also received $8,000 as a special fee for some insurance litigation for the company.

nection with the evaluation of his legal services to the executors in the Chancery Division opinion.

■ It is clear that in appraising the value of legal services to an estate, such services must be segregated from services by the attorney rendered as a fiduciary, for which he is separately compensated by commissions on corpus and income. *In re Estate of Simon,* 93 *N. J. Super.* 579, 585 (App. Div. 1967); *N. J. S. A.* 3A:10–8.

■ Although an examination of the affidavit of services discloses a considerable number of items readily identifiable as legal services to the estate, there are numerous others more to be characterized as services as executor or corporate director, or as legal services to the company for which payment was to be separately made. Many of the items overlap. The brief of two of the beneficiaries analyzes the services as breaking down to 523 hours for services to executors; 163.50 for services to the corporation, and 159.75 for services as executor. The trial court accepted a breakdown by other counsel as reflecting 739.75 hours of legal services to the executors (but not discriminating as to legal services to the company). The $200,000 counsel fee allowed below breaks down to $270 per hour on the basis of 740 hours and $382 per hour on the basis of 523 hours. In our judgment, even the smaller rate is clearly excessive for ordinary legal services attendant upon an estate administration not involving any significant litigation, if any at all.

The foregoing conclusion is made with full deference to the trial court's high opinion of Mr. Orlando's status at the bar, in which we concur, and with such recognition of the factor of the amount involved in the estate as is appropriate. See *In re Bloomer,* 37 *N. J. Super.* 85, 94 (App. Div. 1955).

The trial court appears, from its opinion, to have been influenced by Mr. Orlando's statement in his affidavit that:

As legal counsel for the estate, the task fell largely to me to guide the administration of the estate, to coordinate the efforts of the executors in the administration of the estate and to coordinate the

efforts made over a period of several years to accomplish an appraisal of the estate's assets, the efforts to find a buyer at an acceptable price, and the efforts made to effectuate the actual sale.

However, it is plain that this leadership role pertains essentially to the status of executorship, not legal services, and should be recognized, if in fact warranted, by a suitable share in the gross corpus commissions awarded to the executors for services as such, not by inflation of the value of legal services rendered by Mr. Orlando individually.

We conclude that a fair valuation of the services of counsel in this administration is $135,000, and the award of counsel fee is modified accordingly.

## IV

Corpus commissions will be fixed as follows:

| | |
|---|---|
| 5% of the first $100,000 . . . . . . . . . . . | $ 5,000. |
| 1.75% of the balance of $9,124,553.83 . . | 159,679.68 |
| 1.75% of the total $9,224,553.83 for factor of additional executors . . . . . | 161,429.68 |
| | $326,109.36 |

Counsel fee will be fixed at $135,000.

Judgment modified as to corpus commissions and counsel fee in accordance with this opinion, and affirmed as so modified.