149 N.J. Super. 41 (1977)
372 A.2d 1365
IN THE MATTER OF THE ESTATE OF CORA TALMAGE WEHRHANE, DECEASED.
Superior Court of New Jersey, Chancery Division.
Decided April 1, 1977.
*43 Mr. Robert E. Swanson for United States Trust Company of New York, successor trustee under the estate of Cora T. Wehrhane.
Mr. William B. Lawless, a member of the New York Bar, argued the cause for defendant John Gardiner Lord (Messrs. Hawkins, Delafield and Wood, attorneys of counsel), and Mr. William P. Ford, attorney.
Mr. Everett M. Scherer for defendants The Hospital Center at Orange, Community Services for the Prevention of Cruelty to Children, and St. John's Guild (Messrs. Riker, Danzig, Scherer and Debevoise, attorneys).
Mr. Dean A. Gaver, Mr. Ashley Steinhart and Mr. Robert C. Epstein argued the cause for defendants David T. McGovern and Coleman B. McGovern, executors of the estate of *44 Doris M. McGovern and Maud Pilkington Blacker, Ind. (Messrs. Hannoch, Weisman, Stern and Besser, attorneys).
Mr. George Warren appeared on behalf of Mally Lord Ramos, Talmage Lord and Jennifer R. Lord (Messrs. Warren, Goldberg and Berman, attorneys).
LESTER, J.S.C.
This case comes before the court on the third intermediate accounting of the trust under the will of Cora T. Wehrhane. One a prior accounting the New Jersey Supreme Court held that a provision in a will leaving property to "issue" of another is presumed not to include the adopted child of the daughter of the testatrix. We are now asked to reconsider the question based on subsequent changes in the decisional law of this State. The case raises a substantial, if not altogether novel, question of the duty of a court to enforce a prior holding, the legal reasoning of which having been undermined by later rulings.
Mrs. Wehrhane died on March 13, 1925, and her will was admitted to probate soon after. Letters testamentary and of trusteeship were issued to her husband, Henry H. Wehrhane, who remained executor and trustee until his death in 1950, whereupon plaintiff was appointed successor trustee.
Mrs. Wehrhane's will, bearing the date January 5, 1925, provided for payment of her residuary estate to the trustee in trust, to pay the net income first to Mr. Wehrhane for life and then to her daughter, Dorothy Wehrhane Lord, for life. After the death of the daughter, this fund was designated to go to the "issue" of the daughter, per stirpes, and if no issue, to be divided in a specified proportion between Dorothy's husband, if living; Doris M. McGovern, decedent's cousin, and six charitable institutions. If Dorothy left no husband or issue, the husband's share would be shared between Doris M. McGovern and Maud Pilkington Blacker.
On January 14, 1931, nearly six years after the death of testatrix, Dorothy and her then husband adopted a son, who was named John Gardiner Lord. The daughter, up until the *45 adoption and thereafter, had no natural children. At the time of the filing of plaintiff's first accounting for the period March 13, 1950, to May 3, 1954, on October 22, 1954, the adopted son, John Gardiner Lord, on behalf of himself and his infant children, filed a complaint in the Chancery Division seeking to establish his interest in the estate as "issue" of his mother Dorothy, as the term was used in the will of Cora T. Wehrhane. The cases were consolidated and, after trial, it was determined by Judge Drewen, J.C.C. temporarily assigned, that the adopted son did not qualify as "issue" under the will of Cora T. Wehrhane to claim any interest in the estate. Judge Drewen held Doris McGovern and the six charities to have vested remainder interests, subject to divestment by the birth and survival of a natural child of the daughter of decedent. In re Wehrhane's Estate, 41 N.J. Super. 158 (Ch. Div. 1956), aff'd 23 N.J. 205 (1956) (Weintraub, J., dissenting) (hereinafter Wehrhane I). In view of this decision, the adopted son had no participation in the second accounting for the period May 9, 1954 to September 13, 1961, approved April 19, 1963. Subsequent New Jersey Supreme Court cases changed the state of the law as it was announced in Wehrhane I, holding that the terms "children" and "issue" in a will included adopted children, in the absence of language or evidence evincing a contrary intent, even for wills executed prior to the passage of reform legislation. In re Coe, 42 N.J. 485 (1964); In re Thompson, 53 N.J. 276 (1969).
In the present complaint for the third intermediate accounting, Paragraph 11 states that by virtue of the subsequent changes in New Jersey law, as announced by the Coe and Thompson decisions, the court should make a determination whether John Gardiner Lord and his issue qualify as issue of Dorothy Wehrhane Lord (now Nicholas) within the meaning of the will of Cora T. Wehrhane.
The opinion of Justice Oliphant in Wehrhane I stated the applicability to the case at bar of the "stranger-to-the-adoption rule." This rule provided that a gift made to children *46 or issue of another "is presumed not to include an adopted child or children * * *" (Wehrhane I, supra, 23 N.J. at 208) a presumption which may be rebutted by other language in the will or "circumstances surrounding and existent at its execution or the death of the testator." Id. In the remainder of the opinion Justice Oliphant endeavored to find any such language or factual circumstance that might disturb the presumption of exclusion. He found none. In his scrutiny of will terminology he found, to the contrary, that use of the term "issue" was a term deliberately used by the draftsman to exclude the possibility of adopted children taking under the will.
The evidence adduced by Mr. Lord in an attempt to rebut the presumption of exclusion was that the will indicated a design to benefit the persons nearest and dearest to Mrs. Wehrhane's daughter. This evidence was found inadequate by the court, which cited that there was no evidence that Dorothy would not have a natural child or that it was present to Mrs. Wehrhane's mind that any plans for adoption were contemplated. In addition, the court was unpersuaded by expert opinion that grandparents ordinarily do not discriminate against their adopted grandchildren by noting the portion of the expert testimony in which it was remarked that attitudes toward adopted children have changed considerably in the last 25 years. Wehrhane I, supra at 210, 211.
The court rejected the view that the operation of the exclusionary presumption may be altered by the existing adoption statute which gave adopted children full rights to inheritance. R.S. 9:3-9, as superseded by N.J.S.A. 9:3-30. The court specifically found that this statute, adopted in 1877, not to have created
* * * a rule of testamentary construction opposed to the judicial presumption that has always been attached to the word "issue" as a term of purchase and its consequent effect in determining the inclusion or exclusion of adopted children. [at 209]
*47 As a result, the presumption of exclusion was found applicable and unrebutted. Since the burden was on Mr. Lord to establish proof of an incusionary intent, there was no affirmative proof offered of any exclusionary intent, other than the fact that the legal consequences of exclusion of the term "issue" were understood by the draftsman.
Justice Weintraub, in his dissenting opinion, vigorously disputed the view of the majority of the applicability of the 1877 adoption statute and the exclusionary presumption. It was not until the composition of the court changed and Justice Weintraub assumed the position of Chief Justice that the jurist's views became law. In re Coe, supra, rejected the dictum in Wehrhane I that use of the term "children" brought into play the stranger-to-the-adoption exclusionary presumption. More importantly, it recognized the 1877 adoption statute as embodying a rule of construction by which adopted children are presumed to share in any testamentary bequest unless a contrary intent is manifested. Coe explicitly refused to extend the Wehrhane I exclusionary rule to apply to use of the term "children" but did not overturn the Wehrhane I rule as it applied to the use of the term "issue." The court concluded (42 N.J. at 495), "In summary, then, we will not extend Wehrhane and if that case is to be followed at all, it will be confined to its precise holding."
In In re Thompson, supra, the court, again led by Chief Justice Weintraub, was faced with the construction of a will executed in 1935 wherein property was devised to the "lawful issue" of the daughter of the testator. The Wehrhane I approach, which was understood by the Thompson court to be that use of the term "issue" brought into play the stranger-to-the-adoption exclusionary presumption, was rejected and was replaced in Thompson by an inclusionary presumption by operation of the 1877 adoption statute. The court also rejected the view advanced in In re Fisler, 133 N.J. Eq. 421 (E. & A. 1943), that the term "issue" meant heirs of the body. Thompson, supra, 53 N.J. at 299.
*48 It is contended on behalf of Mr. Lord that the Wehrhane I decision was, and is, bad law and that a court should not in good conscience deprive the adopted son of his inheritance in deference to an ill-conceived decision. Defendants dispute the characterization of Wehrhane I as bad law and, further, maintain that the essential legal doctrines of res judicata and collateral estoppel operate to prevent any relitigation at the present time.
It is clear that insofar as Wehrhane I was based on the operation of legal presumptions, it has been not merely distinguished or limited but overruled.
As stated previously, the legal presumption of exclusion of adoptees utilized in Wehrhane I was limited to construction of the term "issue," but that the exclusionary presumption finally gave way to the opposite presumption of inclusion in Thompson, supra at 298. Of course, essential to this progression was the holding of Coe that the 1877 adoption statute represents a rule of construction, despite language in Wehrhane I to the contrary. Coe, supra, 42 N.J. at 489.
If Wehrhane I were based solely on the operation of a legal presumption of exclusion, there would be no question that Wehrhane I was indeed "bad law" in that it has no precedential value under the doctrine of stare decisis. However, it is argued by the remainderman that Wehrhane I rests on an alternate ground for its decision  the actual intent manifested by the testatrix. Those who would uphold Wehrhane I place particular reliance on this aspect of Wehrhane I, arguing that while Wehrhane I's pronouncement of the law may have come into disrepute with the passage of time, its conclusions of fact with regard to Mrs. Wehrhane's testamentary intent has not been, nor can be, subject to challenge.
The operative language in Wehrhane I setting forth the alternate grounds of the decision must be carefully examined:
*49 The decision below must be affirmed, not only in view of the words used to express the desire of the testatrix, but also, were it to be concluded that she did not consider the possibility of adopted children, in view of the presumption long recognized in this State that a bequest to the "issue" of another does not include adopted children. * * * [23 N.J. at 211]
It is to be noted that the court does not merely posit "testamentary intent" as a basis but rather "the words used to express the desire of the testatrix * * *". In re Wehrhane, supra at 211 (emphasis supplied). As stated previously, there had been no affirmative proof of an exclusionary intent other than the use, in her will, of the term "issue" as opposed to some other which might have been chosen to indicate a desire to include children who may be adopted by her daughter.
From the above-cited language it can be seen that testamentary intent was not considered as an alternate holding of the court. The operative language of Wehrhane I bears reiteration:
The decision below must be affirmed, not only in view of the words used to express the desire of the testatrix, but also, were it to be concluded that she did not consider the possibility of adopted children * * *.
The unmistakable meaning of the above language is that if Mrs. Wehrhane considered the problem, she decided against including adopted children by the use of the will terminology. The opinion and, indeed, the entire proceedings were devoid of any evidence tending to prove that Mrs. Wehrhane actually did consider the problem of adoption by her daughter at the time the will was executed. To the contrary, the evidence adduced showed that Mrs. Wehrhane had no indication that her daughter was barren or was considering adopting a child. Because the court expressly left undecided the question of whether Mrs. Wehrhane, at the time of execution, considered the possibility of adopted children, no finding was made with respect to Mrs. Wehrhane's *50 actual intent to exclude or include adopted children. The meaning of the above paragraphs is not that the court affirmatively found actual intent to exclude but rather that the adopted son had failed to convince the court that the intent of the testatrix to include adopted children of her daughter would be gleaned from the will itself. Therefore, the son's case fails (a) on the basis of actual intent, if she did consider the question, and (b) by the operation of law, if she did not consider the question. Since the court did not make a finding with respect to this choice, it cannot be said that the court held as a matter of fact that the testatrix had an actual intent to exclude adopted children of her daughter from taking under the will.
This court is cognizant of an ambiguity in the language of the opinion, the wording of which at first blush appears to support the view that the court in Wehrhane I employed testamentary intent as an alternate holding:
The decision below must be affirmed not only in view of the words used to express the desire of the testatrix, but also * * *. [Emphasis supplied]
Read within the context of the opinion, however, it is apparent that rather than fashioning an alternate holding based on testamentary intent, the court merely made a finding of fact that the will terminology did not manifest a design to include adopted children.
Even assuming, arguendo, that the holding in Wehrhane I was alternately based on testamentary intent to exclude, based on words used to express testamentary intent, the court would have been in error.
It is clear from the above-cited language that, assuming the court made an alternate holding based on testamentary intent, the premise of the court's reasoning would have been that as a matter of fact, at the time of the execution of the will in 1925, the term "issue" meant bodily heirs and not adoptees and that use of the term "issue" in a will was an unequivocal indication of an exclusionary intent on the part *51 of the draftsman. In In re Thompson, supra, this factual finding was rejected. The Thompson Court considered the construction of a will in which an adoptee claimed under a clause devising property "to the issue" of his children. The natural children argued that the very use of the term "issue" in the context of the prevailing legal knowledge of 1935 is evidence of an exclusionary intent. The court disagreed, finding that use of the term "issue" as of the date of the will could not be taken as evidence of an intent to exclude adoptees in light of (a) the operation of the 1877 adoption statute and cases construing the same or similar statutes in other jurisdictions, and (b) New Jersey cases construing the term "issue" in context of its use in wills. Thompson, supra, 53 N.J. at 292, 297. The historical analysis of Thompson was supplemented in In re Estate of Cory, 98 N.J. Super. 208 (Ch. Div. 1967) in which Judge Mintz found that it was not until 1932, in Dulfon v. Keasbey, 111 N.J. Eq. 223 (Ch. 1932) that it was established that "issue" of another is exclusive of adopted children. In re Estate of Cory, 98 N.J. Super. at 221. Therefore, if the Wehrhane I Court made a finding with respect to testamentary intent, its "finding" was based on a misstatement of the law applicable in 1925.
Were it not for the fact that John Gardiner Lord litigated the question in 1954, there is no question but that this, or any court, would find in his favor if a trial were conducted utilizing the evidence offered previously. By operation of the rule of construction announced in Coe and Thompson, supra, Mr. Lord would take under the will unless the alternate remaindermen could prove a testamentary intent to exclude. A contemporary court would also have the benefit of the scholarship of Thompson and, therefore, find that mere use of the term "issue" in a 1925 will could not be used as affirmative proof of an exclusionary intent. There being no evidence to rebut the inclusionary presumption, Mr. Lord would prevail.
*52 However, this court is profoundly mindful of the fact that Mr. Lord did, indeed, litigate the very issue posed today and that an authoritative ruling was rendered against him by this State's highest court. Against Mr. Lord's argument for a renewed determination stand the powerful doctrines of res judicata and collateral estoppel.
In an attempt to avoid the application of these doctrines, counsel for Mr. Lord argue that the 1954 New Jersey Supreme Court decision was not ripe and that the court was without jurisdiction to determine the remaindermen. Counsel argue that as long as the life tenant, Mr. Lord's mother, remained alive, questions as to the eventual distribution of the trust are not properly before a court. Ogden v. McLane, 73 N.J. Eq. 159 (Ch. 1907); In re Hosford, 26 N.J. Super. 412, 421 (App. Div. 1953); Kellogg v. Burnett, 74 N.J. Eq. 304, 309 (Ch. 1908); Schumacher v. Howard Savings Inst., 128 N.J. Eq. 56, 63 (Ch. 1940), aff'd 131 N.J. Eq. 211 (E. & A. 1941).
This argument must be rejected. The 1954 decision on the question of remainder interests was not a mere abstract judgment but was necessary for the determination of tax consequences to the remaindermen. The New Jersey Supreme Court specifically found that the question was ripe:
* * * A determination of the question is essential in order that certain other issues raised in an accounting proceeding (instituted by the present trustee) may be resolved. * * * [In re Wehrhane, supra, 23 N.J. at 208]
A similar tax problem exists at the present time with respect to other remaindermen. If we are to accept Mr. Lord's argument, we would conclude that the question is not ripe at this time either. It is clear, however, that a declaration of remainder interests under the trust is a proper exercise of the court not only in 1954 but also at the present time under the Declaratory Judgment Act. N.J.S.A. 2A:16-55. The decision in Wehrhane I was a final decision.
*53 In law there can scarcely be a more important policy than finality:
The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. * * * [Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)]
The principle of finality holds even as to cases based on law that was subsequently found to be misconceived. Perth Amboy Dry Dock Co. v. Crawford, 103 N.J.L. 440, 444 (E. & A. 1927); see also, Restatement of Judgments, § 1 (1942), and comments. Counsel for the charitable remaindermen overstates the case for finality in characterizing the protection afforded to successful litigants as the vesting of constitutional property interests. Such an approach was rejected by the New Jersey Supreme Court in In re Arens, 41 N.J. 364, 386 (1964). It follows that those cases cited which argue for the inviolability of final judgments with respect to will construction on the basis of constitutionally protected rights are inapplicable to the case at bar. Deposit Bank v. Frankfort, 191 U.S. 499, 24 S.Ct. 154, 48 L.Ed. 276 (1903). See In re Catherwood Trust, 405 Pa. 61, 173 A.2d 86 (Sup. Ct. 1961).
The law does not recognize finality as the only rule pertaining to the applicability of prior decisions:
* * * The nature of the judicial process requires the power to revise, to limit, to overrule if justice is to be done. * * * So also does necessity. Rules of law are constantly evolving or changing. * * *. [In re Thompson, supra, 53 N.J. at 299]
*54 It is with regard to the necessity of change in the interest of justice that the doctrine of finality gives way to the doctrine of retroactivity. Thompson, id.; Fox v. Snow, 6 N.J. 12, 14 (1950). In rules promulgated by the New Jersey Supreme Court it has been established that final decisions may be the subject of relitigation in exceptional circumstances:
On motion, with briefs, and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: * * * (f) any other reason justifying relief from the operation of the judgment or order. [R. 4:50-1]
This rule and its predecessor, R.R. 4:62-2(f), as construed by our courts, establishes the principle that in a case of particularly compelling equities, relief from final judgments may be afforded. Shammas v. Shammas, 9 N.J. 321 (1952); Greenberg v. Owens, 31 N.J. 402 (1960); Bauer v. Griffin, 104 N.J. Super. 530 (Law Div. 1969), aff'd 108 N.J. Super. 414 (App. Div. 1970), certif. den. 56 N.J. 245 (1970). A mere change in the decisional law will not suffice. The moving party must demonstrate extreme hardship and clear equity in his favor. Doyle v. Chase Manhattan Bank, 80 N.J. Super. 105, 121 (App. Div. 1963).
The application of this rule to the relitigation of wills construed in a prior judgment is not entirely unchartered territory. In re Estate of Cory, supra.
Before the court in Cory was a request for instructions for final distribution of an estate established under the 1926 will of William F. Cory, who died in 1929. The will provided for certain life interests in each of his two daughters, with additional stipends for their children and a remainder to the "children" then living of both of said daughters. Testator executed the will shortly after one of his daughters brought a foster child into her home, but died prior to his daughter's adoption of the child. In order to determine whether payments for the benefit of the adopted son could *55 be made under the terms of the will, an action was commenced in 1939 in the Chancery Division for construction of the will. In an unreported decision the Chancellor found that the adopted son did not fall within the class designated as children and, therefore, did not qualify as a remainderman for purposes of final distribution or immediate additional income to his mother.
The question of the child's interest in the estate was raised anew in an action for the allowance of the final account. Judge Mintz, commenting on the intervening change in the decisional law, noted that under the rules relief from a final judgment could be obtained in exceptional cases pursuant to R.R. 4:62-2(f) (now R. 4:50-1). Cory, supra, 98 N.J. Super. at 216.
Judge Mintz found that the undistributed nature of the corpus was the critical equity in favor of the adopted son which, when coupled with the change of decisional law, required a finding in his favor. He relied on In re O'Mara, 106 N.J. Eq. 311 (Prerog. 1930), in which Ordinary Walker overturned a prior decree at a time when the law had changed but the corpus had remained undistributed:
* * * where a fund remains in the hands of an administrator undistributed, and the construction of a statute as to its distribution by the court of last resort in this state changes the law as directed by the orphans court and the prerogative court on appeal herein, and whose decisions differ from that of the court of last resort, it would be intolerable to permit a distribution in accordance with the orphans court and prerogative court where, as stated, the court of last resort has construed the statute differently * * *. [In re O'Mara, at 316, 317; cited in Cory, supra, 98 N.J. Super. at 217]
In summarizing his holding, Judge Mintz stated:
In examining the equities in the instant case, the court stresses the existence of the undistributed corpus and the inherent inequity in ordering a distribution not in accordance with the present decisional law as set forth in Coe. Account must also be taken of the adoptee's minority in 1940 and the debatable disposition by the Chancery decree of his future rights as a remainderman. [Cory, at 218]
*56 Cory remains good law. The reference to Cory in Hartford Ins. Co. v. Allstate Ins. Co., 68 N.J. 430, 434 (1975), merely distinguishes the holding in Cory from those cases which recognize that mere change of law is insufficient grounds for overturning a prior decision. Cory (98 N.J. Super. at 216) clearly adhered to that rule requiring a further showing of equity to compel such reversal.
The parallel between Cory and the instant case is manifest. In both cases operation of a rule of law which had determined a prior holding was subsequently and retroactively changed. In both cases no interim distribution of the corpus was made and, therefore, no remainderman detrimentally changed its position in reliance upon the prior construction by a material change in position.
It is argued by the alternate remaindermen in the case at bar, however, that significant differences exist between the two cases which demonstrate the relatively weaker equities in favor of John Gardiner Lord.
First, it is argued that Cory was based not only on the change of decisional law but also on the basis of new evidence discovered. This argument must be rejected since Judge Mintz framed the question before him to be whether the prior decree should be overturned by operation of R.R. 4:62-2(f) rather than R.R. 4:42-2(b) (newly discovered evidence). Cory, supra at 216.
Secondly, it is argued that Wehrhane I, unlike Cory, was based in part on a factual determination, not merely on the operation of a later discredited rule of law. As we have noted elsewhere, (a) our interpretation of Wehrhane I is that the court did not expressly find a testamentary intent to exclude but rather found Mr. Lord's attempt to demonstrate his grandmother's inclusive testamentary intent from the language of the will itself unpersuasive in light of the will terminology, and (b) even assuming the Wehrhane I court did make a finding of actual intent, that finding was itself based on a misinterpretation of the state of the law in 1925.
*57 We must add, further, assuming that there was a finding of fact with respect to actual intent, this finding could not have constituted a holding of the court in the absence of the operation of a legal presumption of exclusion. Therefore, since the burden of proof by subsequent decisional law has shifted in favor of the adoptee, the legal basis of any holding with respect to actual intent would have been nullified.
Third, it is argued that the relative equities as between adopted children and other remaindermen are starkly different in Cory and Wehrhane I. In Cory a distribution to the adopted grandson would only enlarge a class of remaindermen already numbering five so that the share to each would be reduced by only a fraction. In Wehrhane I, on the other hand, a finding favorable to Mr. Lord would "divest" the alternate remaindermen entirely.
This argument is unpersuasive to the court. Not having actually received a distribution, the alternate remaindermen had only an expectancy of an eventual distribution in their favor  an expectancy based solely upon their good fortune in having the will construed in 1954. To characterize a new ruling against their expectancy as a "loss" or as a "divestment" is a mere exercise in rhetoric. In addition, it is not clear that the balance of equities in Cory was more favorable to a determination in favor of the adopted grandson. The court in Cory laid particular stress on the injustice of permitting a distribution contrary to present law, which excluded an adopted child. Yet, it is to be noted that the court was cognizant of the fact that the child, in light of the prior legal interpretation of the will which excluded him from sharing in his grandfather's estate, was bequeathed his mother's entire estate as a form of compensation. No such alternate provision for Mr. Lord has been cited by counsel.
Finally, it is argued that Mr. Lord, unlike the adopted minor in Cory, did not merely acquiesce in the decision of the trial court but appealed his case to the highest court of our State judicial system. As a result, it cannot be said that Mr. Lord was not fully cognizant of his rights or was not *58 afforded ample opportunity to present his case. Therefore, it is argued, a contemporary court should not give Mr. Lord another "bite at the apple."
This court finds the above reasoning to be singularly unpersuasive. We have found that if Mr. Lord had never litigated in 1954 but rather awaited the present time and presented precisely the same evidence as he actually did present, he would prevail. Equity, it is said, protects only the vigilant, and yet it is argued before this court that Mr. Lord should receive no share of the estate in question not because the will does not include him but solely because he vigilantly litigated the question two decades ago. Such a construction flies in the face of reason and justice. The remaindermen's basic error is to conceive of prior adjudication itself as being one of the "equities" to be weighed into consideration by a court in the application of R. 4:50-1(f). To the contrary, the function of the rule in question is to enable a court to consider whether the values of equity and fairness may, in a given circumstance, supersede the finality of prior adjudication.
Remaindermen also note that Wehrhane I, having been appealed to the New Jersey Supreme Court, this court is without jurisdiction in overturning the previous rule. By contrast, Cory, in ruling contra to the prior decree of the Chancery Division, only overturned the ruling of a sister court.
I find that the present exercise of jurisdiction is proper. While it is undoubtedly true that a court of inferior jurisdiction is bound to apply the holding of an appellate court, Reinauer Realty Corp. v. Paramus, 34 N.J. 406, 415 (1961), the decision of this court today merely conforms a prior holding of the New Jersey Supreme Court in Wehrhane I with later rulings by the New Jersey Supreme Court of the law as it existed at the time of Wehrhane I. Coe and Thompson, supra. In applying the rules of construction as set forth in those latter cases, this court pays complete obedience to *59 the principle of stare decisis. Tharp v. Shannon, 95 N.J. Super. 298 (Law Div. 1967).
In sum, we find John Gardiner Lord to have a vested remainder interest in the trust established under the will of Cora T. Wehrhane. Under the decisional law of our State, Mr. Lord, as an adopted child, is presumptively included in a will devising property to "issue." We have carefully examined the evidence submitted in prior litigation bearing on the question of testamentary intent and find no evidence whatever to rebut the presumption of inclusion. Critical to our decision today is the fact that no party has materially changed its position in reliance on any prior decision of the courts of this State. The corpus of the trust remains wholly undistributed. This court is convinced that a distribution that would not include Mr. Lord, based as it would be on a ruling of law that was later found incorrect, would constitute a manifest miscarriage of justice.
The remaining portions of the accounting will be approved. This court is satisfied that the corpus commission bears a fair relationship to the actual labors and risks undertaken by the trustee. In re Estate of Moore, 50 N.J. 131, 148 (1967). In particular, I find the yearly percentage of one-seventh of one per cent of average fair market value corpus commission to be fair and reasonable in light of the standards set forth in In re Estate of Seabrook, 127 N.J. Super. 135, 139 (App. Div. 1976); N.J.S.A. 3A:10-2(a)(3). Counsel fees are also approved. Although a substantial portion of these services were indicated to be allocated among the out-of-state law firm's in-house accountants, I find that the work of the accountants was necessary for the preparation of this account. I note, however, that certain of the duties undertaken by the firm's accountants were properly functions performed by the trustee. This factor has been taken into account in my determination of a reasonable trustee's commission.